Susan McKENZIE, Plaintiff–Appellant,

v.

ILLINOIS DEPARTMENT
OF TRANSPORTATION,
Defendant–Appellee.

No. 95–2365.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1996.

Decided Aug. 5, 1996.

**476**

Patricia L. Hayes (argued), Hayes Law Office, Springfield, IL, for Plaintiff–Appellant.

Susan Frederick Rhodes, Rita M. Novak, Office of the Attorney General, Chicago, IL, Karen J. Dimond (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant–Appellee.

Before RIPPLE, MANION and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

Susan McKenzie works for the Illinois Department of Transportation ("IDOT") in a supplies warehouse. She brought this claim under Title VII alleging that she was subjected to sexual harassment and to a hostile working environment. She also alleges that she was subjected to retaliation for filing complaints with the EEOC and with the Illinois Human Rights Commission. The district court granted summary judgment for the defendants and dismissed Ms. McKenzie's supplemental state law claim. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

Ms. McKenzie works for IDOT in a supplies warehouse in Springfield, Illinois. She is responsible for managing the supplies used in repairing IDOT equipment. In 1990, Ms. McKenzie periodically was required to leave work for physical therapy sessions. During her absences, Donald "Buck" Croft, an IDOT mechanic, was assigned to fill in temporarily for Ms. McKenzie. Ms. McKenzie was given the task of training Croft on the computerized inventory system used to manage the supplies. She characterized her previous working relationship with Croft as "friendly," although they did not speak very often. R. 23, Ex. B, Deposition of Susan McKenzie, at 45.

Ms. McKenzie worked alone in the office of the supplies warehouse. She was supervised by James Ketchum, but was trusted to work independently without daily monitoring. During the summer of 1990, the garbage in the warehouse was allowed to accumulate for

a long period of time. The smell of the garbage, aggravated by the summer's heat, made Ms. McKenzie ill on July 25, 1990, and she vomited. Ms. McKenzie claims that Croft, who was training with her that afternoon, remarked that James Ketchum had "screwed around with [her] so much that [she was] probably pregnant." R. 1, Complaint, at para. 13. Croft allegedly repeated this comment to two other co-workers in James Ketchum's presence. Although Ms. McKenzie was not present at the time the remark was repeated, Croft later told her that he had done so. Ms. McKenzie did not report the July incident to Ketchum because she assumed Ketchum was already aware of the matter and that he would take some action against Croft.

Ketchum did nothing as a result of the remark, and no other incidents of untoward conduct occurred until early October 1990. At that time, Croft called Ms. McKenzie at her office. He said that he had heard that drinking coffee induces sexual arousal and, because he was coming over to her office, wanted to know if she was drinking coffee. When he arrived, the two of them were alone in Ms. McKenzie's office for a few minutes; according to her deposition, Ms. McKenzie was "petrified" to be with him. R. 23, Ex. B, at 74.

In mid-October, Ms. McKenzie learned, through a coworker, of another sexual comment made by Croft about her. According to the co-worker, a group of employees, including Jim Ketchum, were in the break room, placing bets in a baseball pool. Ketchum remarked that he would go get a dollar from Ms. McKenzie so that she could participate in the wager, and Croft remarked that Ketchum should instead "take it out in trade." R. 23, Ex. B, at 64.

On October 19, 1990, Ms. McKenzie complained to Ketchum about the coffee comment and about the baseball pool incident. According to Ms. McKenzie's deposition, Ketchum asked her three times how she learned of the baseball pool incident; Ms. McKenzie did not tell him who repeated the comment to her. She also claims that Ketchum told her to ignore Croft because he was simply a barroom bully. In response to her complaint, Ketchum sent Croft to see Ms. McKenzie in the hope that the two of them could work out their differences. Croft went to Ms. McKenzie's office on October 24, but she did not wish to speak to him; she stated that she was "scared to death" to be alone with Croft. R. 23, Ex. B, at 76.

On October 29, in response to Ms. McKenzie's complaint to Ketchum, IDOT management held a meeting with Ms. McKenzie, Ketchum, Bill Favri (Ketchum's supervisor), and a union representative. At that meeting, it was agreed that Ms. McKenzie would suffer no retaliation for bringing her complaint, that IDOT management would ensure that Croft stayed away from Ms. McKenzie, and that a memo would be issued to all employees regarding IDOT's sexual harassment policy. The memo was issued several weeks following the meeting, and no further incidents occurred between Croft and Ms. McKenzie. In fact, she stated that she saw Croft at work only one other time after October 1990, when he was sent to the warehouse to unload a truck.

In addition to her sexual harassment claim based upon the three sexually oriented comments made by Croft, Ms. McKenzie also alleges that she was subjected to retaliation for complaining of Croft's behavior. She points to two incidents that followed the October 29 meeting. First, on October 30, Ms. McKenzie learned from a co-worker that the mechanics were told that they could no longer go to Ms. McKenzie's building to pick up their supplies. Instead, other employees (apparently assistants to the mechanics) were to be responsible for picking up the supplies. Second, in November 1990, Ms. McKenzie overheard Dick Goodrum, a mechanics supervisor, say, while speaking on the telephone, "I'm going to discipline her some way after this sexual harassment is over." R. 23, Ex. B, at 91. Ms. McKenzie believed that she was the only employee who had brought a sexual harassment complaint, and thus she understood the comment to concern her.

After these two incidents, on November 15, 1990, Ms. McKenzie filed a complaint against IDOT with the Illinois Department of Human Rights, alleging sexual harassment based upon the comments made by Croft.

On February 21, 1991, Ms. McKenzie amended her original complaint against IDOT to charge additional incidents of discriminatory treatment.[1] Both the original and the amended complaints against IDOT were cross-filed with the EEOC. On the same day she amended her original charge against IDOT, she also filed a charge with the Illinois Department of Human Rights against Croft individually, alleging sexual harassment and retaliation.

Ms. McKenzie alleges that, after she filed her original charge and the February amendment to that charge, she was subjected to several other incidents of retaliation. On February 26, 1991, an employee in the accounting office, Bill Warren, was told by his supervisor that he was not permitted to deliver invoices to plaintiff's office; rather, Ms. McKenzie was required to walk over to the accounting department in order to sign the invoices, which previously had been delivered to her. In March 1991, a coworker of Ms. McKenzie overheard a conversation between Dick Goodrum and Croft in which Croft was told that he would have to "change his input" for an upcoming hearing on Ms. McKenzie's claims. R. 23, Ex. B, at 98. In April 1991, a co-worker needed to retrieve a supply from Ms. McKenzie's warehouse, but he refused to enter Ms. McKenzie's office. He instead waited outside while another employee picked up the supply for him. When Ms. McKenzie stepped outside and asked why he could not get his own supplies, he stated that he had been instructed not to enter Ms. McKenzie's office. In October 1991, Ketchum told Ms. McKenzie that she could not leave the premises on her breaks, whereas other employees were allowed to leave during their break times. In June 1992, Ketchum testified in a hearing that he had been aware of Croft's comments to Ms. McKenzie,

despite his earlier denials of such knowledge. In January 1993, Ketchum told Ms. McKenzie that she had to call him whenever an item was delivered to her department; Ms. McKenzie stated that this additional requirement doubled her workload and caused her to suffer a nervous breakdown. In August 1994, a vendor refused to enter Ms. McKenzie's building, stating that Ketchum had forbidden him from doing so. Finally, in the fall or winter of 1994, Ms. McKenzie learned that Bill Favri told other IDOT employees that they were not to give affidavits to Ms. McKenzie to assist her in her litigation against IDOT.

### B. District Court Proceedings

The district court initially ruled on Ms. McKenzie's sexual harassment claim and granted summary judgment for IDOT. The court reasoned that, although Ms. McKenzie subjectively perceived her work environment to be hostile and abusive, the three comments by Croft, occurring over a two and a half month period, were not sufficiently severe that a reasonable person would feel subjected to a hostile working environment. Examining all of the comments together, rather than in isolation, the court concluded that they did not create an objectively hostile environment under the standard articulated in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (objectively hostile environment exists when harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment").[2]

The district court later ruled upon Ms. McKenzie's claim of retaliation and, again, the court granted summary judgment for IDOT. With respect to most of the retaliatory acts alleged by Ms. McKenzie, the court

---

1. Ms. McKenzie charged, in her amended complaint against IDOT, that the drinking water in her building was contaminated and that she had to bring her own drinking water to work, whereas other employees had water provided to them by IDOT. She also charged that the garbage was not taken out of her building on a regular basis, causing her to become ill. These claims of discriminatory treatment, however, do not form the basis for either of the claims alleged in Ms. McKenzie's complaint.

2. The district court also relied upon three cases, each of which involved incidents more severe than those alleged by Ms. McKenzie, in which a hostile environment was held not to exist. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1995) (overturning jury verdict in favor of plaintiff); *Weiss v. Coca-Cola*, 990 F.2d 333 (7th Cir.1993) (affirming summary judgment for defendant); *Saxton v. A.T. & T.*, 10 F.3d 526 (7th Cir.1993) (same).

held that she had failed to establish a prima facie case of discrimination, primarily because she had not shown that she suffered any adverse consequences as a result of IDOT's actions. As to two of the incidents, the court held that Ms. McKenzie had established a prima facie case of retaliation; in neither instance, however, did Ms. McKenzie produce evidence tending to show that the legitimate, nondiscriminatory reasons offered by IDOT for its actions were pretextual.[3] Thus, summary judgment was entered for IDOT on Ms. McKenzie's claim of retaliation.

## II

## DISCUSSION

■■■ We review the district court's entry of summary judgment in favor of IDOT de novo. *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 477 (7th Cir.1995). Summary judgment is appropriately entered " 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Buckley Dement, Inc. v. Travelers Plan Adm'rs of Illinois*, 39 F.3d 784, 787 (7th Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In the course of this inquiry, we must draw all reasonable inferences in favor of the party against whom summary judgment was entered. *Jones v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 42 F.3d 1054, 1057 (7th Cir.1994). Only when we determine that no reasonable factfinder could decide for the nonmoving party is summary judgment appropriate.

*Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir.1993).

### A. Sexual Harassment

■■■ The Supreme Court, in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986), held that Title VII's prohibition against discrimination on the basis of sex protects employees against unwelcome sexual advances that create an offensive or hostile working environment. Harassment need not be linked to an economic quid pro quo; rather, it encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment. *Id.; Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir.1994). For the harassment to be actionable, it must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere. *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405–06. The Court emphasized, in *Harris*, that the statute protects the worker against conduct a reasonable person might find hostile or abusive. However, if the victim does not subjectively regard the environment as abusive, the conduct has not actually altered the victim's employment and there is accordingly no Title VII violation. *Harris*, 510 U.S. at 20–22, 114 S.Ct. at 370.

■■■ Noting that this approach is not susceptible to a "mathematically precise" test, the Court held that the required determination can be made only by evaluating all of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humil-

---

**3.** The first instance in which the district court found that Ms. McKenzie had established a prima facie case of retaliation involved Bill Warren. Because Mr. Warren was no longer able to deliver invoices to Ms. McKenzie, Ms. McKenzie's job was made more difficult; she had to walk over to the accounting office in order to sign the invoices that previously had been delivered directly to her. However, IDOT claimed that Mr. Warren's job did not require that he deliver the invoices and that he was accident prone. Thus, Mr. Warren's supervisors did not want him roaming about the premises. The district court held that Ms. McKenzie had failed to offer any evidence to show that these reasons were pretextual.

The court also found that the incident with the vendor, who had been told not to go inside Ms. McKenzie's building, established a prima facie case of retaliation. IDOT explained the incident as resulting from a change in policy: Under the new purchasing policy, Ms. McKenzie did not have the authority to order supplies, thus making it unnecessary for vendors to speak with Ms. McKenzie at all. The court held that Ms. McKenzie's failure to offer any evidence casting doubt on IDOT's proffered reason warranted summary judgment for IDOT.

iating, and whether it unreasonably interferes with the worker's performance." *Id.* at 22–24, 114 S.Ct. at 371. Our circuit has noted that isolated and innocuous incidents will not support a hostile environment claim. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir.1994). "Title VII is not directed against unpleasantness per se but only . . . against discrimination in the conditions of employment." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994).

■■■■ Although Ms. McKenzie clearly established that she subjectively feared Croft and perceived his comments toward her to be harassing, we cannot hold that those three comments amounted to sexual harassment under the standard set forth in *Meritor* and *Harris.* As the standard has been articulated by the Supreme Court, we are required to consider the alleged harassment from an objective perspective and ask whether a reasonable person would perceive his or her environment to be hostile or abusive. As mentioned above, several factors guide our consideration of that question, including the frequency, severity, and disruptive effect of the offensive behavior. In this case, Ms. McKenzie was the object of three sexually suggestive comments over a three month period. Although Croft's comments were most certainly offensive, we cannot hold that the frequency or severity of the comments rose to the level of "unreasonably interfer[ing]" with Ms. McKenzie's working environment. *Harris,* 510 U.S. at 22–24, 114 S.Ct. at 371.

■■■■ However, even if we were to agree with Ms. McKenzie that the conditions of her working environment were unreasonably affected by Croft's behavior toward her, we still would uphold the judgment of the district court. When an employee is harassed by a co-worker, the employer may be held responsible only if "the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir.1989) (citing *North v. Madison Area Ass'n for Retarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 407 (7th Cir.1988)). If an employer takes reasonable steps to discover and rectify the harassment of its employees, however, it has discharged its legal duty. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir.1995). "An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Brooms,* 881 F.2d at 421. We are not to focus "solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed." *Id.* The reasonableness of an employer's response depends, in part, on the gravity of the harassment alleged. *Baskerville,* 50 F.3d at 432.

According to Ms. McKenzie's deposition, she complained to Ketchum, her supervisor, on October 19, 1990, of Croft's comments.[4] Ketchum initially responded by asking Croft to talk with Ms. McKenzie, in the hope that the two of them could "work things out."[5] R. 23, Ex. C, Deposition of James Ketchum,

---

**4.** The first comment made by Croft to Ms. McKenzie occurred in July 1990. Later, Croft repeated his "pregnancy" remark to Ketchum, in the presence of two other employees, and reported to Ms. McKenzie that Ketchum "got mad and left" after the remark. R. 23, Ex. B, at 62. In his deposition, Ketchum stated that he did not recall hearing Croft's pregnancy remark. Ms. McKenzie did not report the July comment to her supervisor because she believed that he already was aware of the remark.

Assuming that Ketchum did learn, in July, that Croft had made the comment to Ms. McKenzie, we do not think that, under the circumstances of this case, this knowledge was sufficient, at that moment, to trigger a duty on the part of IDOT

management to take immediate action. First, Ms. McKenzie did not voice her concern with the remark in any way. Second, there is no evidence that Croft had caused problems in the past, thus giving IDOT a reason to be especially suspicious of his remarks. Finally, the suggestive comment was not the type of harassing conduct that is so severe that an employer should have been alerted to a continuing and serious problem.

**5.** Ketchum's initial response—asking Croft to speak with Ms. McKenzie—was not necessarily inadequate; it may have been a reasonable hope that Ms. McKenzie and Croft could "work things out" informally, given what appears to have been an amicable working relationship in the past.

at 26–27. However, Ketchum also reported Ms. McKenzie's complaint to his supervisor, Bill Favri. Within ten days, a meeting was held to discuss Ms. McKenzie's complaint. At that meeting, it was agreed that Croft would have no further contact with Ms. McKenzie and that a memo would be issued to all employees regarding IDOT's policy against sexual harassment. After the meeting, Ms. McKenzie did not hear any further comments from Croft and, in fact, saw him briefly on only one other occasion at work, when Croft was sent over to unload a truck. Under these circumstances, we hold that IDOT's response was a reasonable one, given the gravity of the harassing conduct alleged by Ms. McKenzie; moreover, it was completely effective. Thus, even if Croft's comments rose to the level of being sexual harassment under the standard articulated in *Meritor* and *Harris*, the "prompt and remedial action" taken by IDOT prevents recovery by Ms. McKenzie on this claim. *Baskerville*, 50 F.3d at 432 (citing *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 794 (5th Cir. 1994) (per curiam)). The district court properly granted summary judgment to IDOT on Ms. McKenzie's sexual harassment claim.

## B. *Retaliation*

### 1.

■ Before examining the merits of Ms. McKenzie's retaliation claim, we must first consider the incidents of retaliation she recounts and determine which are properly before this court. Ms. McKenzie first complained to her supervisor about Croft's sexually suggestive remarks on October 19, 1990. A meeting was held to discuss the remarks, and Ms. McKenzie claims that two incidents of retaliation occurred after that meeting: First, she learned that the mechanics were no longer to pick up their supplies from her; second, she overheard a comment made by the mechanics supervisor that suggested that she would be disciplined for bringing her complaint.

After these two incidents, Ms. McKenzie filed her first administrative charge against

IDOT with the Illinois Department of Human Rights. That charge, which was cross-filed with the EEOC, alleged sexual harassment but did not mention retaliation; Ms. McKenzie left blank the box at the top of the form indicating that she had suffered retaliation. On February 21, 1991, Ms. McKenzie amended her original charge against IDOT to allege additional incidents of discriminatory treatment.[6] Again, the allegations did not include charges of retaliation, and the box for "retaliation" at the top of the form was not checked. On the same day, Ms. McKenzie filed another charge alleging sexual harassment and retaliation, but that charge was lodged against Croft alone and did not mention or implicate IDOT in any way.

■ Generally, a Title VII plaintiff may bring only those claims that were included in her EEOC charge, *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir.1994), or that are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir.) (en banc), *cert. denied*, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). We have held that this standard is met

> if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge.... The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals.

*Cheek*, 31 F.3d at 501. We have previously explained the reasoning behind this requirement:

> This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, and of giving the employer some warning

---

**6.** The allegations of the amended charge are recounted in note 1, *supra*, and do not form the basis for Ms. McKenzie's appeal.

of the conduct about which the employee is aggrieved. Although the rule is not jurisdictional, it is a condition precedent with which Title VII plaintiffs must comply. For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge.

*Id.* Recognizing that the original charge is often completed by laypersons rather than lawyers, we have noted that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.*

Clearly, Ms. McKenzie did not allege retaliation against IDOT in either her original or her amended charges. Because of this failure, Ms. McKenzie's claim of retaliation may be considered by this court only if it can be said that there is a "reasonable relationship" between the allegations against IDOT found in the charge and the allegations of Ms. McKenzie's complaint. In the context of retaliation claims, several courts have addressed the precise situation that we now face. The Fifth Circuit, in *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir.1981), considered the case of a plaintiff who alleged retaliatory discharge after bringing discrimination charges against his employer, yet failed to assert this claim prior to filing his lawsuit. The Fifth Circuit held that it was "unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge." *Id.* at 414. The *Gupta* opinion gives several reasons for permitting such retaliation claims to proceed:

It is the nature of retaliation claims that they arise after the filing of the EEOC charge. Requiring prior resort to the EEOC would mean that two charges would have to be filed in a retaliation case—a double filing that would serve no purpose except to create additional procedural technicalities when a single filing would comply with the intent of Title VII. We are reluctant to erect a needless procedural barrier to the private claimant under Title VII, especially since the EEOC relies largely upon the private lawsuit to obtain the goals of Title VII. Intertwined with this practical reason for our holding is a strong policy justification. Eliminating this needless procedural barrier will deter employers from attempting to discourage employees from exercising their rights under Title VII.

*Id.* (citations omitted). Similar results have been reached by other circuits considering the same situation. See *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066 (2d Cir.1980) (holding that act of retaliation was "directly related" to plaintiff's initiation of litigation and that no second EEOC charge was necessary); *Nealon v. Stone*, 958 F.2d 584 (4th Cir.1992) (holding that retaliation claim may be raised for the first time in federal court); *Carter v. South Cent. Bell*, 912 F.2d 832 (5th Cir.) (reasoning that because other Title VII claims were properly before court, jurisdiction existed over retaliatory termination claim as well), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991); *Bowman v. Block*, 940 F.2d 1211 (9th Cir.) (holding that retaliation claim was "reasonably related" to prior sex discrimination claim), *cert. denied*, 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991); *Brown v. Hartshorne Public Sch. Dist. No. 1*, 864 F.2d 680 (10th Cir.1988) (holding that retaliation arising out of first EEOC filing was "reasonably related" to that filing, obviating the need for a second EEOC charge); *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167 (11th Cir.1988) (adopting reasoning of *Gupta*). *But see Waiters v. Parsons*, 729 F.2d 233, 237 n. 10 (3d Cir.1984) (declining to adopt "per se rule" of *Gupta*).

Our circuit and the Sixth have identified a limit, however, to the reasoning of *Gupta*. In *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534 (7th Cir.1988), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3191, 105 L.Ed.2d 699 (1989), we noted that *Gupta* and similar cases "all involved situations where the alleged retaliation arose after the charge of discrimination had been filed." *Id.* at 545. In such cases, only a single filing was necessary to comply with the intent of Title VII; a double filing "would serve no purpose except to create additional procedural technicalities." *Id.*;

*see also Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1312 (7th Cir.1989) ("[W]e join the other circuits that have spoken to the question in adopting the rule that a separate administrative charge is not prerequisite to a suit complaining about retaliation for filing the first charge."). The Sixth Circuit's opinion in *Ang v. Procter & Gamble Co.*, 932 F.2d 540 (6th Cir.1991), similarly rejected the claim of a plaintiff who suffered the alleged retaliatory act prior to his filing of his EEOC charge. Because the plaintiff in *Ang* had already suffered the retaliatory act at the time he filed his EEOC charge, the retaliation "could have been alleged in the original charge," so "no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint." *Id.* at 547.

In this case, Ms. McKenzie alleges several retaliatory acts, and two of those acts occurred prior to her filing of her original EEOC charge. Yet Ms. McKenzie did not mention her claims of retaliation in either her original charge against IDOT or her amended charge filed several months later. Because each of those incidents of retaliation could have been—and should have been—included in her administrative charges, they cannot now serve as the basis of the retaliation claim alleged in her complaint. Under the reasoning of *Steffen*, however, the remaining incidents (i.e., those occurring after the filing of the February 1991 amended charge) may be considered as evidence of Ms. McKenzie's retaliation claim, despite the fact that "retaliation" was not alleged in her administrative filings.

7. We do not foreclose the possibility that another plaintiff might have a cognizable claim of retaliation based on acts which, although seemingly appropriate and nondiscriminatory when considered in isolation, bespeak retaliation when considered together. We do not believe, however, that a fair reading of this record permits the conclusion that such a claim could go to the jury in this case.

8. We agree with the district court's determination that, with respect to the first element of a prima facie case of retaliation, Ms. McKenzie engaged in statutorily protected expression: She filed an original and an amended administrative charge with the EEOC and the Illinois Department of Human Rights, she participated in the

*2.*

■ Turning to those allegations, we note that, in order to establish a prima facie case of Title VII retaliation, Ms. McKenzie must show that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action. *Brenner v. Brown*, 36 F.3d 18, 19 (7th Cir.1994); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992). In order to demonstrate the "causal link," she must demonstrate that IDOT would not have taken the adverse action "but for" the protected expression. *Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir. 1985). Under the familiar McDonnell Douglas burden-shifting analysis, once Ms. McKenzie establishes a prima facie case, the burden of production shifts to IDOT to come forward with a legitimate, non-retaliatory reason for its actions. *Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1294 (7th Cir.1986). If IDOT rebuts Ms. McKenzie's prima facie case in this manner, she then has a chance to show that the IDOT's proffered reasons are pretextual. *Id.*; *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 478–79 (7th Cir. 1995). Ms. McKenzie alleges that, after she filed her original charge and the February amendment to that charge, she was subjected to several incidents of retaliation. We shall examine each [7] to see if the incident amounted to an act of retaliation.[8]

■ First, on February 26, 1991,[9] an employee in the accounting office, Bill Warren,

investigation of her claims, and she filed this lawsuit. Our analysis, therefore, will focus on whether Ms. McKenzie suffered adverse employment action and whether she has established the necessary causal link between her expression and the adverse action.

9. At one point in Ms. McKenzie's deposition, she states that this incident occurred in December 1990. However, at another point, she states that this incident was one of the several acts of retaliation that occurred after she had filed her amended charge against IDOT. As discussed above, the timing of this incident is critical to our review of it. Because we must review the record in the light most favorable to Ms. McKenzie, we will assume that the Bill Warren incident oc-

was told by his supervisor that he was not permitted to deliver invoices to plaintiff's office; rather, Ms. McKenzie was required to walk over to the accounting department in order to sign the invoices, which previously had been delivered to her. We agree with the district court that, as to this incident, Ms. McKenzie has established a prima facie case of retaliation. By eliminating the convenience of having the invoice forms delivered to Ms. McKenzie, IDOT certainly made her job more difficult. Furthermore, this adverse action occurred within days after Ms. McKenzie filed her amended administrative charge. However, IDOT has offered a legitimate, non-retaliatory reason for its action. According to the deposition testimony of Dick Goodrum, manager of day labor, Bill Warren was told not to walk around the premises because he was "accident prone." R. 23, Ex. D, at 54. Furthermore, none of the other employees in Warren's position delivered invoices personally. Ms. McKenzie has failed to present any evidence tending to cast doubt on this reason and thus fails to survive summary judgment as to this incident.

■ The second and third allegations of retaliation both fail for the same reason. In March 1991, a co-worker of Ms. McKenzie overheard a conversation between Dick Goodrum and Croft in which Croft was told that he would have to "change his input" for an upcoming hearing on Ms. McKenzie's claims. In April 1991, a co-worker needed to retrieve a supply from Ms. McKenzie's warehouse, but he refused to enter Ms. McKenzie's office. He instead waited outside while another employee picked up the supply for him. When Ms. McKenzie stepped outside and asked why he could not get his own supplies, he stated that he had been instructed not to enter Ms. McKenzie's office.

Ms. McKenzie provides only her own recitation of each of these events as evidence that they occurred; she did not depose the co-workers who made the comments or otherwise secure admissible evidence to support these incidents. As such, they cannot be considered in opposition to IDOT's motion for summary judgment. *See Winskunas v.*

curred in February 1991, after Ms. McKenzie

*Birnbaum,* 23 F.3d 1264, 1268 (7th Cir.1994) (hearsay incapable of creating a genuine issue of material fact); *Powers v. Dole,* 782 F.2d 689, 696 (7th Cir.1986) ("On a summary judgment motion, when a party seeks to offer evidence through exhibits, they must be identified by affidavit or otherwise be admissible.").

■ Fourth, in October 1991, Ms. McKenzie alleges that she was told by Ketchum that she could not leave the premises on her breaks, whereas other employees were allowed to leave during their break times. The deposition of James Ketchum, however, reveals that, as a matter of policy, no employee was permitted to leave the property during breaks. This policy applied to Ms. McKenzie as well as the mechanics and all other employees. Furthermore, permission was granted on occasion to individual employees when requested, and Ms. McKenzie acknowledged that, on two occasions, she left the premises to run errands and was not disciplined in any way. Thus, even if we agreed with Ms. McKenzie that the restriction on her break times adversely affected the conditions of her employment and that she had established a prima facie case of retaliation, it would still be apparent that she has failed to present any evidence tending to cast doubt on the testimony of Mr. Ketchum that the break policy applied to all employees.

■ Fifth, in June 1992, Ketchum testified in a hearing that he had been aware of Croft's comments to McKenzie, despite his earlier denials of such knowledge. As the district court reasoned, it is difficult to see how this recantation by Ketchum affected the plaintiff adversely; rather, for Ketchum to admit that he had knowledge of Croft's comments bolsters Ms. McKenzie's case. Plaintiff has not established a prima facie case with respect to this action.

■ Sixth, in January 1993, Ketchum told Ms. McKenzie that she had to call him whenever an item was delivered to her department; Ms. McKenzie stated that this additional requirement doubled her workload

filed her amended charge against IDOT.

and caused her to suffer a nervous break-down. The district court reasoned that, as to this incident, Ms. McKenzie had failed to establish a prima facie case of retaliation because the timing between her protected expression (the February 1992 administrative charge) and the retaliatory act was too long to establish causation. We agree with the district court that, as the temporal distance between Ms. McKenzie's protected expression and the adverse action increased, it is less likely that there is a causal link between the two events. Our research reveals that other cases which permit claims of retaliation after similarly long periods of time each involve additional circumstances which raised suspicion about the legitimacy of the employer's acts. *See, e.g., Moss v. Southern Ry. Co.*, 41 FEP 553, 1986 WL 10510 (N.D.Ga. 1986) (one-year time span between expression and retaliation did not defeat plaintiff's claim where termination was disproportionately severe punishment for minor error); *Ross v. Kansas Comm'n on Civil Rights*, 45 FEP 1476, 1985 WL 17574 (D.Kan.1985) (one-year time span did not defeat plaintiff's claim in light of plaintiff's prior outstanding job performance); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir.1992) (plaintiff's verdict affirmed, despite fourteen-month time span between expression and retaliation, where retaliation occurred two months after the EEOC dismissed the complaint). Because Ms. McKenzie cannot point to any other evidence that makes the January 1993 policy change suspicious, we agree with the district court that Ms. McKenzie has failed to establish the causation element of a prima facie case with respect to this incident.

▪ Seventh, in August 1994, a vendor refused to enter Ms. McKenzie's building, stating that Ketchum had forbidden him from doing so. The district court held that this incident did not amount to an adverse effect on the terms and conditions of Ms. McKenzie's employment; her job was not impaired or made more difficult because certain people were not permitted to speak to her. Thus, she failed to establish a prima

facie case of retaliation because she could not show that she suffered any adverse action.[10]

▪ It would seem that, under the proper circumstances, an employer who orders other employees not to talk to a Title VII claimant could indeed retaliate against that claimant by, in effect, ordering others to shun her. *Cf. Harris v. Richards Mfg. Co.*, 511 F.Supp. 1193, 1203 (W.D.Tenn.1981) ("[T]he present plaintiff was shunted off to an isolated corner in retaliation for her filing of [race] discrimination complaints against the company. The transfer was not temporary but appeared to be permanent, and was [to] . . . an isolated area of the plant."), *aff'd. in part and rev'd in part*, 675 F.2d 811 (6th Cir.1982). However, even if that scenario were present here and Ms. McKenzie had stated a prima facie case of retaliation, IDOT offers a legitimate reason for the incident: Ketchum testified that IDOT had changed its purchasing procedures and that, under the new system, the purchasing agent made all supplies purchases. Thus, it was unnecessary for Ms. McKenzie, or other storeroom personnel, to talk to vendors. Ms. McKenzie has not responded with any evidence tending to cast doubt on this reason. Therefore, she cannot survive summary judgment on her retaliation claim based upon this incident.

▪ Finally, in the fall or winter of 1994, according to the affidavit of a co-worker, Bill Favri told other IDOT employees that they were not to give affidavits to Ms. McKenzie to assist her in her litigation against IDOT. This event occurred while Ms. McKenzie was in the midst of her litigation against IDOT; she filed her complaint in the district court in June 1993 and the court issued its first ruling in March 1995. Because of the proximity of this incident to some stage of the litigation, Ms. McKenzie's claim with respect to this allegation does not suffer the same deficiency as the January 1993 incident with Ketchum.

However, we cannot say that this act would support a charge of retaliation. Our earlier case law suggests that "adverse ac-

---

10. By August 1994, Ms. McKenzie was in the middle of her litigation with IDOT; she filed her complaint in June 1993 and the court's first ruling was issued in March 1995. It does not

appear that, as to this claim of retaliation, Ms. McKenzie faces the same "causation" problem that she faces with respect to the January 1993 incident.

tion" for purposes of establishing retaliation under Title VII must, in the context of pre-discharge retaliation, be job related. *See Reed v. Shepard,* 939 F.2d 484, 493 (7th Cir.1991). Assuming the continued vitality of the requirement that the adverse action be job-related in pre-termination cases, it is difficult to see how such a case can be made on this record. True, these cases recognize that adverse job action cannot be narrowly defined as to include only the loss of a job or a reduction in pay or benefits. *Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir.1987). Rather, it can take other forms as well:

> For example, other courts have found adverse job impact, where there was no reduction in salary or benefits, in an employer's moving an employee's office to an undesirable location, transferring an employee to an isolated corner of the workplace, and requiring an employee to relocate her personal files while forbidding her to use the firm's stationary [sic] and support services.

*Id.* Nevertheless, even under a more expansive understanding of adverse job action, however, we cannot conclude that Favri's threat, even if acted upon, impacted Ms. McKenzie's employment adversely.

More recent cases have cast a significant shadow on the earlier view that an employer's retaliation in the pretermination situation must be job-related. *See Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881 (7th Cir. 1996); *McDonnell v. Cisneros,* 84 F.3d 256, 258–59 (7th Cir.1996). However, even if, as these later cases suggest, the retaliatory activity need not be job related, the alleged activity cannot support the charge. An attempt to obstruct the litigation of the underlying discrimination complaint, like oppressive discovery requests and the withholding of other evidence, is inseparable from the litigation of the claim. Accordingly, it is a matter to be resolved pursuant to court rules, not by Title VII. Of course, if Favri or IDOT had punished any employee for supplying Ms. McKenzie with assistance in her Title VII claim, that employee would have had a remedy under Title VII. *See* 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to dis-

criminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation....").

### Conclusion

For the reasons in the foregoing opinion, the judgment of the district court is affirmed.

AFFIRMED.