**Megan MURRAY, Plaintiff,**

v.

**Chief Leon R. KUTZKE, Deputy Chief Steven Williams, Lieutenant Dane Cuny, Lieutenant Daniel Neustadt, Sergeant Scott Watkins, Sergeant James Glennon, Officer Karl Alagna, Officer Marilyn Johnson, Officer Scott Heim, Officer Daniel Marciniak, individually and in their official capacities as employees of the Village of Lombardi, and the Village of Lombard, a body politic, Defendants.**

No. 95 C 1921.

United States District Court, N.D. Illinois, Eastern Division.

June 21, 1997.

Kenneth A. Jatczak, John P. DeRose, of John DeRose and Associates, Burr Ridge, IL, for Plaintiff.

Jennifer H. Lee, of Norton, Mancini, Argentati, Weiler & DeAno, Chicago, IL, Michael W. Condon, Michael D. Bersani of Hervas, Sotos & Condon, Itasca, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Former Village of Lombard ("Village") Police Officer Megan Murray ("Murray") has brought this sexual harassment and sex discrimination case against Village and several of Murray's former co-workers. Fed. R.Civ.P. ("Rule") 56 motions for summary judgment have been filed by all of the remaining individual defendants ("Individual Defendants")[1] as to some or all of Murray's claims in which they are named. For the reasons set forth in this memorandum opinion and order, the motions are granted in part and denied in part.

### Facts

Individual Defendants' current motions address only some of Murray's claims and thus raise only limited issues. Consequently, where any potential factual issue is not relevant to the motions, the factual discussion here is based upon the allegations in Murray's First Amended Complaint ("FAC"). Otherwise the facts are taken from the evidence submitted on the Rule 56 motions.

Murray was employed as a probationary police officer by Village from March 15, 1993 to early December 1994. Leon Kutzke ("Kutzke") was Chief of Village's Police Department ("Department") throughout Murray's tenure there.[2] Other Individual Defendants either acted as Murray's supervisors or were fellow officers.

By January 1994[3] Murray had been supervised by both Sergeant Scott Watkins

---

1. Originally-named defendant Officers Karl Alagna, Marilyn Johnson and Daniel Marciniak have previously been dismissed.

2. Except to the extent otherwise stated, all Department personnel referred to here are among the Individual Defendants.

3. All further dates without year designations also refer to 1994 events.

("Watkins") and Sergeant James Glennon ("Glennon"). She has alleged that Glennon sexually harassed her and that both Glennon and Watkins engaged in sex-based discrimination against her in work assignments, assistance and criticisms of her performance. In the spring of 1994 Murray complained to others in her chain of command about Glennon's and Watkins' behavior. She alleges that the offensive conduct ceased briefly and then resumed.

On May 17 Officer Scott Heim ("Heim") complained orally to Glennon about Murray's handling of a domestic disturbance call to which Heim and Murray had responded. Heim's criticism was that Murray seemed confused about the law and department policy as to domestic violence cases and showed poor judgment in failing to arrest the male suspect promptly. At Glennon's request Heim prepared a memo about the incident (Heim Ex. 2). Neither Heim nor Glennon discussed the memo with Murray, although it was placed in her personnel file. Murray disputes Heim's version of the incident and contends that Helm wrote the memo at the request of Glennon, who was allegedly retaliating against her for her harassment complaints about him.

On June 3 Deputy Chief Steven Williams ("Williams") informed Murray that she was being placed on 90–days' "super probation," the purpose of which is disputed.[4] Murray contends that she was being retaliated against for complaining about Glennon's and Watkins' discriminatory and harassing behavior and that Heim's memo was the justification for placing her on super probation. Individual Defendants assert that super probation was only intensified supervision of a remedial nature, that it was based on concerns about Murray's performance and on the perception that she could not get along with her supervisors and that it was unrelated to her complaints. They contend that Heim's memo was also unrelated to the decision, and Murray admits that she was not

told what had triggered her super probationary status.

During their June 3 meeting Williams and Murray had some discussion about harassment and discrimination, and he told her that she should take her complaints to the Village Attorney or the Village Manager. On June 14 Murray made a formal complaint to the Assistant Village Manager and the Village Attorney[5] about Glennon's and Watkins' conduct.

On July 19 Murray filed a charge of sex discrimination with the Equal Employment Opportunity Commission ("EEOC"). In it she named "City of Lombard Police Department" as the only respondent. Murray's narrative description of the discriminatory conduct did not identify any individual by name or position, nor did it describe any specific incident of discrimination (except for her super probation status).

During the super probation period Glennon was assigned as Murray's supervisor. On July 5 Murray was injured while subduing a suspect alone. She alleges that Glennon sat in his squad car and refused to provide back-up for her in retaliation for her complaints about him. As a result of her injury, Murray was unable to work for several months (she did not return until October 31). Murray claims that Kutzke pressured her physician into releasing her to return to work before she was physically ready, while Kutzke asserts that he questioned her physician's refusal to permit her to return only after a physician hired by Village had found her able to work.

Murray was terminated in early December after an internal investigation into an October 23 incident at her home in which she had called 911 after an argument with married co-worker Michael Shackel ("Shackel").[6] Kutzke had ordered the investigation after receiving a report from the Wheaton Police Department, which had responded to the 911 call, and after reviewing the report of an informal internal inquiry conducted by Lieu-

---

4. Although the litigants quarrel about the propriety of the "super probation" label, this opinion will employ that term (hereafter used without quotation marks) purely for convenience.

5. Neither of them is a defendant.

6. Shackel is also not an Individual Defendant.

tenant Dane Cuny ("Cuny"). According to Kutzke, the discrepancies between the story told by the Wheaton officers and the stories that Murray and Shackel told to Cuny raised serious questions about Murray's and Shackel's truthfulness. Murray and Shackel had said that Murray had found a male intruder in her home, that the intruder had fled and that Shackel had just arrived to comfort her. Kutzke says that on that basis as well as Murray's past performance problems he made the decision to terminate her, and on November 28 he obtained permission from the Board of Fire and Police Commissioners to do so. When interviewed as part of the formal internal investigation on November 30, Murray admitted that she and Shackel had lied about his whereabouts just before the 911 call (he had actually attended a wedding with her) and about the reason for the call (they had had an argument), and that those lies were occasioned by the fact that he was a married man. After Murray refused to resign, Kutzke terminated her on December 7.[7]

On November 23 Murray had filed a second EEOC charge, this time asserting sex discrimination, retaliation and sexual harassment. Again she named "City of Lombard Police Department" as the only respondent. Although her narrative did relate a few specific incidents, once again she did not identify any individuals by name or position. Then on December 19 she filed a third charge, alleging retaliation. This time she named Individual Defendants as respondents along with "Village of Lombard Police Department."

Murray's FAC contains claims against all remaining defendants except Heim of sexual harassment under Title VII[8] (Count I), sex discrimination under Title VII (Count II) and retaliation under Title VII (Count III). It also asserts claims against all remaining defendants (including Heim) of discrimination in violation of Section 1983 (Count IV) and intentional infliction of emotional distress (Count V). In addition it asserts a slander claim against Glennon.

At this point all named Individual Defendants seek summary judgment on Counts I through III on the ground that they were not named as respondents in Murray's EEOC charges. Kutzke also moves for summary judgment on all counts because he says he did not personally participate in the alleged discriminatory conduct. Heim seeks summary judgment on Count IV on the ground that Murray lacks proof of an essential element of her claim and on Count V on the ground that the evidence is insufficient as a matter of law.

### Summary Judgment Principles

Rule 56(c) permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." For that purpose this Court does not weigh the evidence submitted by the parties or determine the truth of asserted matters (*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). All facts must be viewed and all reasonable inferences drawn in the light most favorable to the nonmovant (*Transamerica Ins. Co. v. South,* 975 F.2d 321, 327 (7th Cir.1992)). "If no reasonable jury could find for the party opposing the motion, it must be granted" (*Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir.1995), citing *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510).

### Counts I, II and III

Individual Defendants (other than Heim) argue that Murray's Title VII claims in Counts I through III are barred as against them because she did not name them as respondents in her EEOC charges. It is well established that in the absence of the special circumstances identified later in this

---

7. Kutzke testified that Murray was paid for several days after December 7, but it is undisputed that she ceased working for Village on that date.

8. All citations to Title VII provisions and to other statutes that are also found in 42 U.S.C. will simply take the form "Section—," referring to the numbering within 42 U.S.C. and not to the internal numbering in Title VII or any other act.

paragraph, a Title VII plaintiff may sue only persons or entities named in the administrative charge (*Perkins v. Silverstein,* 939 F.2d 463, 471 (7th Cir.1991)). That requirement serves to provide notice to those charged with discrimination so that they may participate in the conciliation process (*Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 126 (7th Cir.1989)). There is a limited exception to that requirement where the narrative portion of the charge also sufficiently identifies undesignated respondents by name or description, so that those persons effectively receive notice that the charge is also leveled against them (*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 906 (7th Cir.1981)).

Murray's first two EEOC charges (D. Exs. F and G) neither named any Individual Defendant as a respondent nor described any of them in the narrative in a manner that would permit their identification. Consequently Murray's Title VII claims based on those two EEOC charges (FAC Counts I and II) are barred as to Individual Defendants. Their motion for summary judgment is therefore granted as to those counts.

■ Murray's third EEOC charge (D.Ex. H), which asserts retaliation as to her termination, is more problematic. She identified Individual Defendants as respondents by noting "See Attachment" in the appropriate box on the form. In turn the "Attachment" named each of the Individual Defendants but listed only Department's street address. Despite that reference to Individual Defendants, none of them was served with notice of the charge.

That situation poses two obvious questions:

1. Did EEOC or Murray bear the burden of serving the third EEOC charge on the named respondents (Individual Defendants)?

2. If the delinquency was EEOC's, should Murray bear the adverse consequences?

As for the first question, the answer is clear: EEOC was responsible for serving notice upon the named respondents, for Section 2000e–5(b) states that "the Commission shall serve a notice of the charge ... on such employer ... within ten days...." That in turn logically controls the second answer, for Murray can scarcely be faulted for EEOC's noncompliance with its statutory duty. Title VII is to be construed liberally (*Philbin v. General Elec. Capital Auto Lease, Inc.,* 929 F.2d 321, 323 (7th Cir.1991)), and its administrative filing requirements are subject to equitable modification (*Perkins,* 939 F.2d at 470). Thus Murray's retaliatory discharge claim is not barred by EEOC's omission (*Russell v. American Tobacco Co.,* 528 F.2d 357, 365 (4th Cir.1975)). As *Vakharia v. Swedish Covenant Hos.,* 824 F. Supp. 769, 775 (N.D.Ill.1993) has put it:

> Sometimes a defendant's right to full participation in conciliation must give way to the plaintiff's right to sue the appropriate parties.

Individual Defendants' motion is therefore denied as to Count III.

### *Kutzke's Motion*

As stated earlier, Kutzke seeks summary judgment on all claims because he contends he had no personal involvement in the discriminatory conduct alleged in Murray's FAC. Murray's allegations against Kutzke fall into two general categories: (1) those related to his alleged failure to act on her complaints about Glennon and Watkins and (2) those related to his participation in her termination, allegedly in retaliation for her complaints. Because FAC Counts I and II (and therefore the first category of Murray's claims) have already been dispatched, only her retaliatory discharge allegations are potentially viable against Kutzke.

Section 2000e–3(a) prohibits discrimination against any employee "because [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." To generate a prima facie case of such retaliation, plaintiff must establish [9] that "(1)

---

9. Because the current motions are advanced under Rule 56, Murray need not "establish" or "prove" anything—instead her burden is the lesser one of creating a genuine issue of material fact. Although this opinion will conform to the case law authorities by employing the type of locution that is reflected in the text, this Court

she engaged in protected opposition to Title VII discrimination or participated in Title VII proceedings; (2) she suffered adverse action by [her employer] subsequent to or contemporaneous with such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action" (*Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111, 1114–15 (7th Cir.1992)). As for that third element, plaintiff must establish that the employer would not have taken the adverse action but for the protected activity (*McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir.1996)). Under the familiar *McDonnell Douglas* formulation, if plaintiff makes out a prima facie case the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse action (*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir.1994)). If it does so, the burden shifts back to plaintiff to show that the proffered reason was a pretext for discrimination (*id.*).

 It is undisputed that Murray filed two EEOC charges before her termination and that her termination constituted an adverse employment action—the first two elements of a prima facie case. As to the third element, Murray contends that Kutzke terminated her in retaliation for her charges of harassment and discrimination, with the timing of the internal investigation and its lack of factual or legal foundation demonstrating the required causal connection. In response Kutzke submits his own deposition testimony (Kutzke Dep. 94–95, 103–04) both as to the conclusions that he drew from the informal inquiry report and as to his purpose in ordering the internal investigation. He also points to Murray's November 30 interrogation (D. Ex. I at 52, 59–60) [10], in which she admitted that the stories she had told the Wheaton police and during the informal inquiry were substantially inaccurate. Murray counters that Kutzke had obtained permission to fire her two days before her November 30 interrogation.

Murray's interrogation does indeed confirm the untruthfulness of her earlier statements regarding the October 23 incident. But while Kutzke did not have Murray's admission in hand when he received permission to terminate her, he did have the Wheaton police report and the informal inquiry report. Kutzke testified that Cuny's report had voiced a strong suspicion that neither Murray nor Shackel was telling the whole truth. While Cuny's hearsay conclusions are not admissible for their own truth, they are importantly relevant as a critical component of the factual matrix for Kutzke's decision to terminate Murray. And of course her November 30 admission underscores the validity of his reasons for terminating her. Although Murray's current affidavit attempts to explain away her admission (P.Ex. A ¶¶ 14–16), it is well settled that a plaintiff may not avoid summary judgment by submitting a self-serving affidavit inconsistent with her prior testimony—even though in this instance the November 30 interrogation was not under oath (as was the situation in all of the earlier cases, such as *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995)), that testimony's context (having been given as part of the formal investigation, see D. Ex. I at 5–6) triggers the same principle.

Not only does Murray lack any direct evidence on the retaliation issue (an often difficult task), but she has also produced no probative circumstantial evidence. Though she does point to the timing of her termination, in most instances timing alone is inadequate to establish causation (*Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir.1992)). Here it is insufficient because Murray offers no other evidence to show that she would not have been terminated but for her protected activity. Instead the evidence confirms that Kutzke had a valid independent reason for firing her.[11]

That leaves only Murray's speculation as to Kutzke's motives. "Circumstantial evi-

---

has consistently applied the less demanding Rule 56 standard.

**10.** Individual Defendants have submitted the exhibits cited as "D. Ex.—."

**11.** It is undisputed that Murray was given the option to resign, which she refused. Shackel did resign.

dence is one thing; conjecture is another" (*Timm v. Mead Corp.*, 32 F.3d 273, 276 (7th Cir.1994)). Murray has produced nothing but conjecture. Kutzke's motion for summary judgment is granted on Count III.

▮ Kutzke also seeks summary judgment on FAC Count IV's Section 1983 claim, which asserts that all defendants violated Murray's right to equal protection by engaging in the same course of conduct (both discrimination and retaliation) that is at issue in her three Title VII claims. On that score, this opinion's grant of summary judgment dismissing Counts I and II does not affect Murray's Section 1983 claim based upon the same conduct, for a public servant may sue her employer for discrimination under Section 1983 without having to satisfy Title VII's administrative preconditions to suit (*Trigg v. Fort Wayne Community Schs.*, 766 F.2d 299, 300–01 (7th Cir.1985)). On the other hand, the just-announced ruling on the merits of Murray's Count III retaliatory discharge claim against Kutzke does bar the portion of her Section 1983 claim that is based upon the same facts. This opinion turns then to Murray's failure-to-act allegations, the sole remaining issue against Kutzke.

Murray contends that Kutzke knew about Glennon's and Watkins' behavior for months without acting to prevent it. To support that assertion she submits her own affidavit, in which she attests that Officer Gary Johnson ("Johnson")[12] told her in November 1993 that her complaints of harassment had been discussed at a chief's meeting that Johnson also attended. She also contends that her complaints were common knowledge throughout Department by January or February 1994. Both statements are inadmissible hearsay, which under Rule 56(e) may not be considered on summary judgment. Murray has not submitted an affidavit from Johnson as to the chief's meeting, and she may not testify as to the truth of his asserted statements about it. As to Murray's complaints being common knowledge, she has offered only her own conclusion to that effect—she has submitted no affidavit or testimony from anyone indicating that Kutzke knew about them. As against that absence

of admissible evidence, Kutzke expressly testified that he did not learn of Murray's complaints until early June 1994.

Murray's submissions fail to create a genuine issue of material fact as to whether Kutzke knew of her complaints before June 1994. But Kutzke is not home free, for some of Murray's assertions relate to later-occurring events. Kutzke testified that he learned from Williams that Murray might have a complaint of sexual harassment or discrimination after Williams had met with Murray on June 3 (Kutzke Dep. 78–79). Williams confirmed that (Williams Dep. 79–80). That was the date on which Murray was placed on super probation, something of which Kutzke was undisputedly aware. While Williams and not Kutzke made the decision as to Murray's super probation, Kutzke reviewed that decision (Kutzke Dep. 84; Williams Dep. 37), and it is surely a reasonable inference that as Williams' superior he could have overridden it as well. Thus Kutzke's review cannot be seen merely as an automatic rubber stamp that exonerates him of possible liability.

It is also significant that Glennon was assigned as Murray's supervisor during her super probation. While Kutzke testified that he delegated the designation of her supervisor to Williams and was not aware that Glennon had that role (see Kutzke Dep. 87–88), there is no evidence that Kutzke made any effort to determine Murray's situation after he learned of her complaints. He knew that he had a female employee who had complained of sexual harassment and discrimination and that she had just been placed on super probation, yet he made no inquiry into how her super probation was being handled. Indeed, the record reflects that Kutzke did nothing at all after learning of Murray's complaints. He did not discuss the situation with Williams to ensure that Murray's super probation was handled properly in light of her complaints, nor did he even talk to Glennon or Watkins about the complaints (Kutzke Dep. 80–81).

Among other things, that ostrich-like stance on Kutzke's part left one of Murray's

---

12. Johnson is not a defendant.

principal harassers as her supervisor during her super probation period. Kutzke admitted in his deposition that one of the reasons Williams gave him for putting Murray on super probation was her perceived inability to get along with her supervisors (Kutzke Dep. 85). In addition, one month after being placed on super probation Murray was injured on duty under circumstances in which she claims Glennon deliberately failed to assist her. It is a permissible inference that Glennon's assignment as her supervisor was in retaliation for Murray's complaints and may have resulted in her physical injury. To avoid liability for discrimination, an employer is obligated to take appropriate remedial action after learning of an employee's complaints (*McKenzie*, 92 F.3d at 480). Under the scenario here, a jury could well conclude that Kutzke failed to respond properly, so he is not entitled to summary judgment on Count IV.

Lastly, Kutzke seeks summary judgment on Count V's intentional infliction of emotional distress claim. Yet he has made no argument at all on that claim. That aspect of his motion is therefore denied.

### Heim's Motion

Heim also seeks summary judgment on FAC Counts IV and V. In both respects Heim's only conduct at issue is his preparation of the memo criticizing Murray's handling of the domestic disturbance call in May. While Murray does not dispute the circumstances as to the preparation of the memo, she does quarrel with Heim's factual recitation of the incident, with his criticisms of her performance and with Glennon's motives in asking that Heim prepare the memo. Murray contends that Heim's memo was the basis for Williams' decision to place her on super probation about two weeks later (though she testified at her deposition that she was never told the reasons for her super probation).

■ As already noted, sexual harassment and sex discrimination charges may be asserted by public employees against their employers as equal protection claims under Section 1983 (*Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir.1990)). Analysis of such claims may, as with Title VII claims, draw upon the *McDonnell Douglas* burden-shifting approach where there is no direct evidence of discrimination (*Sims v. Mulcahy*, 902 F.2d 524, 538–39 (7th Cir.1990)).

Because Murray has produced no direct evidence against Heim, the claim must be viewed through the *McDonnell Douglas* lens. At the first step, a plaintiff's prima facie case of discrimination involves four showings: (1) that she was a member of a protected class; (2) that she was performing well enough to meet the employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that employees who were not members of the protected class were treated more favorably (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). If plaintiff makes those showings, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse action (*id.*). If the employer does so, then the burden of production shifts back to plaintiff to show that the reason articulated by the employer was a pretext for discrimination (*id.*).

As a woman, Murray was member of a protected class. Although it might be arguable whether she was performing well, Heim does not contest that issue. Thus Murray satisfies the first two elements of a prima facie case. And given the sex-based orientation of all of Murray's claims, the fourth element is met as well.

■ Murray's ability to satisfy the third element vis-a-vis Heim is more problematic. Heim's only action was to write a critical memo about Murray that was placed in her file. That is essentially equivalent to a negative performance review, which does not alone constitute an adverse employment action (*Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir.1996)). But it is also true that Murray was placed on super probation two weeks later. Although this opinion has already said that timing does not of itself establish causation, in this instance the imposition of the super probation status—an adverse action, see *Smart, id.*—was attributed by Williams to a memo from Glennon criticizing Murray's performance (Williams Dep. 37), and it was also Glennon who caused

Heim to reduce his oral complaint to written form for insertion in her personnel file. Even though Heim was concededly not the decisionmaker, and though the issue is certainly a close one, given the benefit of favorable inferences Murray may be viewed as having identified Heim as one of those contributing to the poisoning of the well (see *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400–01 (7th Cir. 1997)).

Heim also seeks to extricate himself from this action on qualified immunity grounds, an effort to which Murray's responsive memorandum does not address itself. But in that respect Heim argues only that it was not "clearly established" when he wrote the memo that such activity constituted an "adverse employment action." That contention ignores the inferential linkage between the memo and the imposition of super probation, which certainly comes well within the broad scope of adverse actions as defined by pre–1994 decisions. Consequently Heim's motion for summary judgment is denied as to Count IV.

 As to Count V Heim argues that writing the critical memo was insufficient as a matter of law to support Murray's intentional infliction of emotional distress claim under Illinois law. *Doe v. Calumet City*, 161 Ill.2d 374, 204 Ill.Dec. 274, 282, 641 N.E.2d 498, 506 (1994) reconfirms these as the elements of such a claim:

(1) the defendant's conduct was extreme and outrageous;

(2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress;

(3) the defendant's conduct in fact caused severe emotional distress.

To be "extreme and outrageous," the conduct must be more than "mere insults, indignities, threats, annoyances, petty oppressions or trivialities" (*Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill.Dec.652, 654, 360 N.E.2d 765, 767 (Ill.1967)).

Heim's argument goes to the first element—the absence of the necessary degree of outrageousness. Murray has simply not responded. Heim is obviously right, and his motion is granted as to Count V.

### *Conclusion*

Because there is no genuine issue of material fact as to FAC Counts I and II, Individual Defendants' motion for partial summary judgment on Murray's Title VII claims is granted as to those counts. Only Village remains as a defendant in those counts. However, Individual Defendants' motion is denied as to Count III.

Next, the same absence of material factual issues requires the granting of Kutzke's motion for summary judgment as to Count III, but his motion is denied as to Counts IV and V. Finally, Heim's motion for summary judgment is granted as to Count V, but it is denied as to Count IV.