Diane MINNIS, Plaintiff,

v.

MUCH SHELIST FREED DENENBERG
& AMENT, P.C., Defendant.

No. 96–C–713.

United States District Court,
N.D. Illinois,
Eastern Division.

March 31, 1997.

George Freeman Galland, Jr., Miner Barn-
hill & Galland, Chicago, IL, for Plaintiff.

Diane Minnis, Gary, IN, pro se.

Irving M. Geslewitz, Michael James Muel-
ler, Much Shelist Freed Denenberg Ament

Bell & Rubenstein, P.C., Chicago, IL, for Defendant.

## *ORDER*

PLUNKETT, District Judge.

We adopt the report and recommendation of Magistrate Judge Pallmeyer dated March 5, 1997 and grant defendants' motion to dismiss plaintiff's first amended complaint with prejudice, for the reasons stated in the report and recommendation.

## *REPORT AND RECOMMENDATION*

PALLMEYER, United States Magistrate Judge.

Plaintiff Diane Minnis, a black female, was employed as a legal secretary by Defendant Much Shelist Freed Denenberg & Ament, P.C. (hereafter sometimes, "the firm") from September 16, 1990 until her termination on August 19, 1994. Proceeding *in forma pauperis,* she has filed a lengthy *pro se* complaint charging the firm with discriminating against her on the basis of religion, sex, and race by discharging her, and by oppressing and harassing her both during and after her termination. Defendant firm has moved to dismiss the complaint as frivolous and groundless. After a careful review of the pleadings and Plaintiff's discovery responses, this court concludes that Plaintiff has not stated a claim for relief against Defendant and that this case should be dismissed pursuant to 28 U.S.C. § 1915(d).

## *Procedural History*

Plaintiff filed her original *pro se* complaint on February 7, 1996. District Judge Paul Plunkett granted Plaintiff's motion for leave to proceed *in forma pauperis* and appointed Attorney George Galland to represent her. Defendant moved to strike Plaintiff's original complaint, which contained 213 paragraphs covering 42 pages, for failure to comply with Rules 8(a)(2) and 8(e)(1). On May 30, 1996, Judge Plunkett granted that motion. On June 13, 1996, Mr. Galland moved for leave to withdraw on the ground that, after investigation, he was unable to file a complaint that would comply with the strictures of FED. R. Civ. P. 11. Judge Plunkett granted that motion and allowed Plaintiff time to retain substitute counsel or to file an amended complaint on her own.

Plaintiff chose the latter course and, on July 5, 1996, filed the complaint addressed in this Report. On July 10, 1996, Judge Plunkett granted Defendant leave to submit interrogatories to Plaintiff by July 24, directed Plaintiff to answer them by August 14, and ordered Defendant to file its answer or other responsive pleading on or before August 26. Defendant has moved to dismiss Plaintiff's complaint for failure to state a claim. In that motion, Defendant argues that Plaintiff's answers to interrogatories demonstrate that Plaintiff is unable to offer any facts that would support her claims of race, sex, or religious discrimination. Plaintiff has filed a motion to strike and a number of other motions addressed below.

On September 5, 1996, Judge Plunkett referred the case to this court for supervision of discovery and for preparation of a report and recommendation on dispositive motions. On November 7, 1996, this court conducted a pretrial conference and heard arguments on the parties' motions. As explained below, the court now recommends that Defendant's motion to dismiss be granted, that Plaintiff's motions be denied, and that the case be dismissed with prejudice.

## *Plaintiff's Allegations*

In her Amended Complaint, filed July 5, 1996, Plaintiff invokes a host of statutory and constitutional provisions. Specifically, she seeks to redress her rights under the Fourth, Fifth, Ninth, Tenth, Thirteenth, and Fourteenth Amendments to the U.S. Constitution; Article IV Section 2 of the Constitution; 42 U.S.C. §§ 1981, 1982, and 1988; and Title VII of the Civil Rights Act of 1964. (First Amended Complaint Under Title VII of the Civil Rights Act of 1964 (hereinafter "Cplt."), ¶ 18.) Plaintiff believes that Much, Shelist discriminated against her on the basis of her race, sex, and religion throughout her employment with the firm (Cplt. ¶¶ 21–31 (Count I)) and ultimately discharged her for these reasons (Cplt. ¶¶ 32–38 (Count II)) and because she objected to sexual harassment

and race discrimination. (Cplt. ¶¶ 39–54 (Count III).) Finally, Plaintiff alleges that Defendant utilized "methods to control Plaintiff that are against Plaintiff's [Christian] religion and beliefs." (Cplt. ¶¶ 110–118 (Count IV).)

Plaintiff makes a number of more specific allegations apparently intended to support the three claims identified above. For example, she claims that Defendant "dictated slavery laws to be applied to Plaintiff because of her race, religion and sex" (Cplt.¶ 55); "condoned and dictated the Black Codes to their employees" (Cplt.¶ 56); and "condoned and dictated to the [sic] their employees the oppression of Plaintiff pursuant to the movie *The Color Purple.*" (Cplt.¶ 57.) Without identifying the individuals involved or the relevant dates, times or locations, Plaintiff alleges that she "was told she was a slave," "was told she would be brought down," "was paid a lower rate of pay than White secretaries that held the same level position as Plaintiff," and was "terrorized by the Defendant on a daily basis because of her race, religion and sex." (Cplt.¶¶ 69, 70, 73, 87.) She alleges, further, that Defendant intentionally harassed her "on a daily basis to make Plaintiff cry" and that Defendant and its agents "intentionally sabotaged Plaintiff's computer, work, personal life and work because of her race, religion and sex." (Cplt.¶¶ 90, 91.)

In addition to these claims, Plaintiff makes several others allegations but fails to explain whether they are intended to state independent claims for relief or to support the three claims identified above. For example, she alleges that Defendant deducted sums from her paychecks for investment in the firm's profit sharing plan, but never made a profit sharing distribution to her. (Cplt.¶¶ 59–61). She claims that Defendant and harassed her by stalking her both during the term of her employment by Defendant and after her termination. (Cplt.¶¶ 75, 76, 82.)

Finally, Plaintiff makes a number of allegations regarding Defendant's conduct that border on the bizarre. She alleges, for example, that "the Defendant its agents and employees" have threatened to kill her and have made at least two attempts on her life. (Cplt.¶¶ 80, 81.) She claims that she suffered particular abuse on holidays: "Plaintiff was specifically harassed, discriminated, abused mentally and emotionally because of her race, religion and color on Valentine's Day, Secretary Day/Week, D–Day, Martin Luther King's Birthday, Good Friday, Christmas, and Thanksgiving." (Cplt.¶ 86.) In addition, she claims that "the Defendant dictated the removal or [sic] Plaintiff's used sanitary items from the bathroom to harass and discriminate against Plaintiff because or [sic] her race, religion and sex." (Cplt.¶ 96.)

Plaintiff's prayer for relief seeks an order reinstating her to her position with Defendant, with retroactive insurance and pension benefits, back pay, compensatory and punitive damages, a pay increase, and compensation to her minor children for the "pain, suffering and loss of educational opportunities and abilities" that Plaintiff claims resulted from her termination. (Cplt.¶ 118.) In her Interrogatory answers, Plaintiff sets her damages claim at $50 million. (Plaintiff's Interrogatory Answers, at 37.)

Several motions are pending before the court. Defendant has moved to dismiss the complaint on the ground that Plaintiff's allegations, "even when read in conjunction with her answers to Defendant's interrogatories, fails [ ] to state any factual basis whatsoever for any claim...." (Motion to Dismiss Plaintiff's First Amended Complaint Under Title VII of the Civil Rights Act of 1964, at 1.) Defendant moves, further, to stay discovery. Plaintiff has filed a motion to strike the motion to dismiss, a motion to strike the motion for a stay of discovery, and a motion to compel Defendant to respond to discovery requests. In addition, she has moved for a temporary restraining order and preliminary injunction against Defendant's alleged discriminatory and criminal conduct. Finally, Plaintiff moves to compel the mental examination of fifteen different persons, including fourteen employees or partners of Defendant law firm.

### DISCUSSION

■ Defendant seeks dismissal of this complaint with prejudice on the ground that the record demonstrates Plaintiff has no cognizable claim for relief. Defendant notes

that the court has discretion to dismiss a complaint that asserts only "fantastic or delusional claims." *Tyler v. Carter,* 151 F.R.D. 537, 540 (S.D.N.Y.1993), *aff'd mem.,* 41 F.3d 1500 (2d Cir.1994). Where, as in this case, a plaintiff proceeds *in forma pauperis,* the statute expressly authorizes dismissal by the district court where the action is frivolous or malicious. 28 U.S.C. § 1915(d). Although an *in forma pauperis* complaint should not be dismissed merely because the court finds the plaintiff's allegations unlikely, dismissal is appropriate where the court concludes that the allegations are fantastic, fanciful, or delusional. *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). Indeed, unlike Rule 12(b)(6), the *in forma pauperis* statute grants the district court with the authority to " 'pierce the veil of the complaint's factual allegations and dismiss those claims whose factual allegations are clearly baseless.' " *Id.* at 32, 112 S.Ct. 1728, quoting *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Defendant law firm asserts that Plaintiff's allegations fall into this category, and that the case must be dismissed at this stage.

On November 7, 1996, this court convened a pretrial conference to permit Plaintiff to explain her claims in her own words. At that conference, Plaintiff explained that her difficulties with Defendant began at a firm holiday party in December 1991. According to Plaintiff, Eddie Turner Blackman, a man she was dating at that time (not an employee of the firm) arrived at the party to drive her home. Before Plaintiff and Mr. Blackman left the party, Plaintiff recalls, another of the firm's secretaries, Ms. Spark Easterling, had a brief conversation with Mr. Blackman. After taking Plaintiff home, Mr. Blackman allegedly returned to the party and took Ms. Easterling home. Within the next days or weeks, Mr. Blackman and Ms. Easterling struck up a relationship that eventually led to their marriage. Plaintiff believes that Ms. Easterling's conduct at the party was improper and disrespectful. More significantly, Plaintiff believes that Ms. Easterling and Mr. Blackman are involved in a campaign of harassment and abuse in which the firm is somehow complicit.

Ms. Easterling is no longer employed at the firm, and Mr. Blackman, as noted, never worked there. Nevertheless, Plaintiff alleges, without factual support other than her belief, that the firm has conspired with these individuals and has placed Mr. Blackman on its payroll to support Blackman's abuse and harassment of Plaintiff. Plaintiff has offered no evidence that would support her suspicions. Nor did she offer any basis for a conclusion that Blackman's vendetta against her is related to her former employer's attitudes with respect to her race, sex, or religion. Plaintiff's argument presents no basis for a claim of discrimination against Defendant.

After hearing her argument, this court also reviewed Plaintiff's answers to Defendant's interrogatories which were, at Judge Plunkett's direction, filed with the Clerk of this court. With regret, this court concludes that Defendant accurately describes Plaintiff's discovery responses as "bizarre and outlandish" (Def.'s Motion to Dismiss, at 3); neither her interrogatory answers nor the allegations of her complaint reflect any factual basis for her claims of discrimination. Plaintiff's interrogatory answers are reviewed in detail below.

### I. *Race Discrimination*

■ In Interrogatory No. 2, Defendant directs Plaintiff to state all factual bases for her allegation that she was terminated because of her race. Plaintiff's answer covers six pages and makes the following assertions:

(1) None of the attorneys employed by Defendant are black. (Plaintiff's Answers to Defendants' Interrogatory (hereinafter "Plaintiff's Interrogatory Answers"), at 6.)

(2) The highest-ranking paralegal at the firm left the firm (Plaintiff does not say when) in order "to keep his mouth shut" concerning extramarital affairs of one of the firm's partners and "to hide the affair he too had with Spark Easterling" some time after December 1991. (*Id.*)

(3) A black female paralegal who had been engaged in interoffice affairs was terminated after December 19, 1991. (*Id.*)

(4) A co-worker told Plaintiff "we are going to bring you down," another said Plaintiff was a "snob," and yet another said Plaintiff was "waiting on a man to return to her," all because Plaintiff, unlike other black employees, refused to be "bought" by Defendant. (*Id.* at 7.) (Plaintiff does not explain how other black employees were "bought," nor does she identify the manner or method in which the firm unsuccessfully sought to "buy" her.)

(5) Defendant conspired with Plaintiff's co-workers to "lace" Plaintiff's facial cosmetics with a chemical that burned her skin, rendering it a darker shade. (*Id.*)

(6) Defendant directed that photographs of Plaintiff, depicted as a monkey or ape, be aired on television. (*Id.* at 8.)

(7) Two employees of Defendant "dictated" that five individuals, including Plaintiff's own three sisters and Plaintiff's own 14 or 15–year old daughter, oppress and humiliate Plaintiff and burn her skin. (*Id.*)

(8) These same employees pressured Plaintiff's roommate to throw her out of her apartment. (*Id.* at 9.)

(9) Other black employees of Defendant "sold out ... for whatever they could get...." (*Id.*)

(10) After Plaintiff asked Mr. Blackman about his relationship with Ms. Easterling, Mr. Blackman attempted to kill Plaintiff. (*Id.*)

(11) Mr. Blackman "made a deal" with Defendant in which he accepted money from Defendant "to oppress, discriminate against, stalk, kill and/or destroy the Plaintiff...." (*Id.*)

(12) Plaintiff dated several other men, but each relationship with another man "was dictated and destroyed pursuant to the deal that the Defendant herein made with Eddie Turner Blackman and Spark Easterling." (*Id.* at 9–10.)

(13) Each of these other men "married or are to marry other women in furtherance of the oppression of the Plaintiff." (*Id.* at 10.)

(14) Because Plaintiff did not "submit" to the "deal" between Defendant and Mr.

Blackman, Defendant took the position that Plaintiff was a slave. (*Id.* at 11.)

(15) Plaintiff was the target of racial slurs. Specifically, without identifying the dates or times of these occurrences, Plaintiff claims that one of her co-workers told her that she is a slave. A firm attorney walked by Plaintiff's desk and said, "Back from whence you came." Another attorney walked by and said, "Crack the whip." She claims one attorney told her she is a "glutton for punishment"; another told her that he intended to make her life "as miserable as possible"; and a co-worker intoned the words "The Color Purple" while Plaintiff was in the bathroom, words Plaintiff characterizes as an effort to communicate that Plaintiff would suffer lifelong retaliation if she were to challenge the discriminatory conduct of Defendant. (*Id.* at 12.) Another co-worker told Plaintiff that she had a master's degree, a statement Plaintiff interpreted to mean that the co-worker believes she is Plaintiff's slave master. (*Id.* at 11.)

(16) Shortly after December 1991, Plaintiff was moved to a location in the back of the office where she was "not allowed to work on any legal work that was relevant to anything." (*Id.* at 11.) In this position, Plaintiff observed a shoe shine person enter the office to shine the shoes of one of the attorneys; Plaintiff interpreted this incident as a message from the firm "that the only thing a Black/Afro American person could do for him or them was to shine their shoes." (*Id.* at 11–12.)

(17) A co-worker predicted that Plaintiff, who is a resident of Gary, Indiana, would find a job in Gary at a McDonald's or K–Mart, a comment Plaintiff interpreted as a threat to degrade her if she did not submit to Defendant. (*Id.* at 13.)

(18) Plaintiff makes several assertions of blackmail efforts. She claims, for example, that Spark Easterling, who had an affair with one of the firm's lawyers, is "blackmailing" that lawyer to obtain the firm's assistance in marrying Mr. Blackman. (*Id.*) Mr. Blackman has videotapes of Plaintiff engaged in private sexual acts, which he is using to blackmail Plaintiff. (*Id.*) Finally, Blackman and Ms. Easterling are blackmailing the

firm, requiring that the firm pay them "money, trips, employment, cars, limousine rides" to continue harassing Plaintiff. (*Id.*)

Plaintiff's interrogatory answers simply provide no support for any claim that her discharge was motivated by race. There is no basis, other than pure conjecture, for linking Mr. Blackman's and Ms. Easterling's conduct or relationship with Defendant. Plaintiff presents no imaginable motive for the firm to assist Ms. Easterling in any effort to marry Mr. Blackman. Nor does she explain how any alleged conspiracy between the firm and Mr. Blackman and Ms. Easterling, both of whom are black, could support a claim that Plaintiff's discharge was racially motivated.

Her allegations concerning alleged slurs are of no assistance. She offers no detail concerning when the alleged comments were made, and does not identify how any of the persons who made the purported comments influenced or participated in her termination. Moreover, several of the alleged "slurs" can be associated with Plaintiff's race only via a leap of fancy (the "master's degree" comment is an example).

Significantly, Plaintiff's interrogatory answers say nothing at all about the circumstances resulting in her discharge. This court concludes that her complaint, even as supplemented by several pages of interrogatory answers, does not state a claim of race discrimination in her discharge.

## II. *Religious Discrimination*

 Plaintiff's claim that her discharge was motivated by religion fares no better. If anything, her answers to Defendant's interrogatory seeking information to support this claim (Interrogatory No. 3) are even more fanciful than those described above. Specifically, in her answers to Interrogatory No. 3 Plaintiff recounts the following:

(1) At an unidentified time and place, a co-worker of Plaintiff's asked Plaintiff whether she believes in God; when Plaintiff responded affirmatively, the co-worker said, "You are cursed." (*Id.* at 14.)

(2) Plaintiff is certain that Defendant has utilized "witchcraft, voodoo and psychics to make employment decisions" concerning Plaintiff. (*Id.*)

(3) Another secretary at the firm professed herself a witch and offered psychic evaluation and fortune telling to Plaintiff and other co-workers. Plaintiff believes Defendant consulted with this woman to "curse" and "oppress" Plaintiff. (*Id.* at 15.)

(4) Some time before December 1991, Spark Easterling gave Plaintiff a piece of cake laced with urine. Plaintiff took the piece home and gave it to Mr. Blackman who, Plaintiff recalls, ate it "as if he was starving to death." (*Id.*)

(5) On another occasion, Plaintiff herself ate cake baked by Ms. Easterling, which she is also certain was laced with urine. (*Id.* at 16–17.)

(6) Defendant agreed to cooperate with Ms. Easterling in "the destruction of the Plaintiff," whose "belief in God is the only mechanism she has used to battle the witchcraft and voodoo that has been attempted to eventually kill her." (*Id.* at 17.)

(7) Plaintiff is being "stalked" by Ms. Easterling and Mr. Blackman. (*Id.*)

(8) To ensure that Plaintiff "would never have a spouse or have sexual relations with a man," Ms. Easterling and another firm secretary practiced witchcraft. Their goal, Plaintiff asserts, was to "oppress[ ] Plaintiff or kill[ ] Plaintiff and to cheat and oppress the Plaintiff herein out of everything (money, car, home, clothing, children, food, men, etc.)." (*Id.* at 18.)

(9) Plaintiff asserts that she was terminated "because of her belief in God rather than witchcraft." (*Id.*)

(10) Plaintiff joined the Glen Park CME Church in Gary, Indiana. A woman Plaintiff characterizes as the "first lady" of that church and who is employed by the Police Department (but who has no apparent connection with Defendant) used her position in the church to oppress Plaintiff. (*Id.* at 19.)

(11) Defendant firm is, "to Plaintiff's knowledge . . . owned and operated by Jewish people." (*Id.* at 19.) A co-worker warned Plaintiff that "the only thing Jews will do for you is keep you poor and strug-

gling and without any money." (*Id.* at 20.) Another employee told her, "You are a black Jew." (*Id.*)

Plaintiff's answer to this Interrogatory concludes that Defendant's conduct is "against the religious beliefs of the Plaintiff herein." She adds to her answer the following words: "Verily, verily I say unto you it is written 'nothing they form against you shall prosper.' This is what Plaintiff believed during this entire situation and is still believing that nothing they have former [sic] against me will prosper. Praise God." (*Id.* at 21.)

Again, having reviewed the answers carefully, this court concludes that none of these assertions support Plaintiff's claim that her discharge was motivated by her religion. Although Plaintiff believes that some of her co-workers have practiced witchcraft, she does not explain how this fact, if true, would support a claim that the firm discriminated against her. Nor is there any link between the Gary, Indiana church member and the Defendant law firm. The facts, if true, that the firm is "owned and operated by Jewish people" and that a co-worker made anti-Semitic remarks similarly provide no basis for a conclusion that Plaintiff was the victim of discrimination. In short, Plaintiff offers no evidence of even a single incident where defendant law firm took any action against her because of her religious beliefs or practices. Thus, even assuming the truth of all of the statements in this Interrogatory answer, Plaintiff has not stated a claim of religious discrimination.

## III. *Sex Discrimination*

■ Defendant's Interrogatory 4 asks Plaintiff to state all factual bases for her allegation that she was terminated because of her sex. Plaintiff's answer to this Interrogatory provides no support for her claim and borders on the fantastical. Specifically, Plaintiff sets forth the following:

(1) Plaintiff claims that during her menstrual period, "Defendant would direct and dictate that the Plaintiff's used sanitary item(s) *i.e.* tampons, toilet tissue, or napkins be removed from the bathroom after Plaintiff may have attempted to change." Indeed, to determine whether Plaintiff was menstruating, she claims, "Defendant directed that the Plaintiff be sniffed on occasion to see if she was stinking." (*Id.* at 21.) On at least one occasion, a co-worker told Plaintiff, "You stink." (*Id.*) Plaintiff offers no information concerning the place, manner, time, or method in which Defendant gave any such directions, nor does she explain to whom the directions were given.

(2) Plaintiff identifies three co-workers who, she claims, did in fact enter the bathroom and "search[ ] the garbage can for Plaintiff's used sanitary item." Afterwards, another co-worker told Plaintiff, "They got it," which Plaintiff believes was a reference to the used sanitary items. (*Id.* at 21–22.) Because Plaintiff was certain that her co-workers intended to use the item to practice witchcraft, she was compelled thereafter to keep her used sanitary items in a plastic bag in her purse. This practice rendered her co-workers unable to determine when Plaintiff was menstruating, which offended them. (*Id.* at 22.)

(3) One firm attorney got a "rush" from the knowledge that Plaintiff was menstruating. (*Id.*)

(4) Another firm employee "had a similar mishap" (apparently an incident in which her clothing was accidentally soiled during her menstrual period) and was permitted to go home and change. (*Id.*)

Defendant urges that these claims are incredible. Even assuming they are true, however, this court concludes that they do not establish a claim of sex discrimination. At most, the evidence reflects cruelty and harassment by co-workers. Plaintiff does not suggest that firm management was involved in the cruelty, nor does she explain how, if at all, the incidents were connected to the decision to discharge her.[1]

1. Notably, there is no indication that Plaintiff complained of this misconduct to firm management. Indeed, Plaintiff states that she "was not in a position to trust informing Norma Lee [apparently a clerical supervisor at the firm] of anything or requesting assistance in that Norma Lee also assisted in the discriminatory employment practices against the Plaintiff herein." (Plaintiff's Interrogatory Answers, at 23.)

## IV. Sexual Harassment

■ Interrogatory 8 asks Plaintiff to state all factual bases for her allegation that Defendant "blatantly sexually harassed and harassed Plaintiff." Sexual harassment has been defined by the Seventh Circuit as "all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996). For harassment to be actionable, it must be so severe or pervasive as to create an abusive working atmosphere. *Id.*

Plaintiff's response to this Interrogatory demonstrates that her experiences do not rise to this level. In fact, Plaintiff's answer makes no reference to the conduct of firm management at all. Thus, Plaintiff asserts that two of her co-workers were dating a former friend of hers and may themselves have been lesbians; another co-worker told Plaintiff, "I hate you because you have long legs" and "You are a sex goddess"; an attorney "made the statement audible to Plaintiff that 'you don't have a top,'" a reference, Plaintiff believes, to her bustline; and another attorney told her she was "too skinny" and needed to gain weight. (Plaintiff's Interrogatory Answers, at 29.) There is also no evidence that Plaintiff ever complained to a supervisor of sexual harassment. In *McKenzie*, the plaintiff was subjected to more explicit sexual comments over a three-month period, which she reported to her supervisor. 92 F.3d at 477–78. Although the incidents were subjectively offensive to the plaintiff, the Seventh Circuit nevertheless concluded that a reasonable person would not have perceived the environment to be hostile or abusive and affirmed *summary judgment for the employer. Id.* at 480–81. This court likewise concludes that the incidents of which Plaintiff here complains, while apparently upsetting to her personally, did not create such a hostile environment as to constitute sexual harassment.

## V. Harassment on Other Grounds

■ Plaintiff has alleged that Defendant harassed and oppressed her on the basis of race, religion and sex, and that Defendant and its employees made "at least two attempts" to kill her. Defendant's Interrogatory 9 seeks a statement of all factual bases for this allegation. In response, Plaintiff referred to an incident in which Defendant allegedly "conspired and sabotaged Plaintiff vehicle to cause it to explode while Plaintiff was driving." (Plaintiff's Interrogatory Answers, at 30.) The day after this incident, a co-worker of Plaintiff followed her into the bathroom and "stood there and watched Plaintiff cry, just to see me suffer." (*Id.*)

The second alleged attempt on Plaintiff's life occurred during the summer of 1995, after she was terminated from Defendant's employment. Plaintiff, who asserts she is not a drug user, ingested food and water that caused her to "fall out in public." Plaintiff was transported to the hospital, where she was advised that drug tests showed she had amphetamines in her system and that she had experienced a life-threatening overdose. (*Id.* at 31.)

Plaintiff provides no factual support for her suspicion that Defendant law firm was responsible for either of these incidents. Nor does she offer a plausible basis for her belief that the firm is motivated to harm her. This court concludes that Plaintiff has no claim for relief for alleged harassment and oppression by Defendant.

## VI. Pay Discrimination

Paragraph 59 of Plaintiff's complaint alleges that she was paid less than white secretaries. In response to Defendant's Interrogatory No. 10 concerning this allegation, Plaintiff admits that the only documents that would support such a claim "are in the sole custody of the Defendant." (*Id.* at 32.) She also states that she was not only paid less than white secretaries, but also other black secretaries. Without some further evidence, there is no basis for a conclusion that pay differentials between Plaintiff and others were based on race.

## VII. Miscellaneous Remaining Claims

Plaintiff has made several additional allegations of wrongdoing on the part of Defendant without explaining whether or how they

relate to her claims of race, sex, or religious discrimination. As described below, this court concludes that Plaintiff can present no factual support for these allegations, either.

## A. Residence in Gary, Indiana

■ For example, Plaintiff has alleged in paragraph 36 of her complaint that Defendant terminated her because she resided in Gary, Indiana. Plaintiff has not explained how this fact, if proven, establishes a claim for relief against a private party, such as Defendant law firm. In any event, the facts Plaintiff offers in response to Defendant's related Interrogatory do not support her allegation. Plaintiff asserts that she is the only secretary ever employed by Defendant who lives in Gary. (Plaintiff's Interrogatory Answers, at 23.) Further, she claims, without identifying the names of the speakers, the dates, or the surrounding circumstances, that "Defendant ... made comments and statements regarding Plaintiff returning to Gary, Indiana for employment." (*Id.*) Plaintiff explains that Defendant's employees occasionally "would run by Plaintiff's desk or run by the Plaintiff," conduct that Plaintiff interprets as a statement that "the harassment and humiliation would not cease until they ran Plaintiff out of the office ...." (*Id.*) Finally, Plaintiff asserts, Defendant has "sabotaged" her efforts to find another job; she has been "stalked" by Spark Easterling and Eddie Turner Blackman and Defendant has "dictated" a "witch hunt" to frighten Plaintiff and to "run Plaintiff out of Gary, Indiana."

Although Plaintiff believes that Defendant has conspired with Ms. Easterling and Mr. Blackman, she simply offers no factual support for that belief. Further, the fact that Plaintiff was the only secretary who lives in Gary and that co-workers ran by her desk do not, even if proven, support a claim that the firm took action against her because of her residence. In any event, Plaintiff has not identified any private cause of action for discrimination on the basis of one's place of residence. This claim must be dismissed.

## B. Oppression and Harassment

Plaintiff alleges in paragraphs 37 and 38 that Defendant terminated her to harass her and to "cause Plaintiff oppression." Unless Plaintiff can demonstrate that the "oppression" of which she claims relates to her charges of discrimination on a ground prohibited by law, however, these allegations by themselves do not provide a basis for recovery.

In response to Defendant's Interrogatories concerning this allegation, Plaintiff asserts, without any factual support or specifics, that Defendant gave "points or gratuities" to anyone who "could make the Plaintiff cry or appear incompetent." (Plaintiff's Interrogatory Answers, at 24.) On two occasions, Plaintiff reports, she walked out of the job, but each time was "lured back" only to be harassed "ten times as much by anyone and everyone ... to the point of depression ...." (*Id.* at 25.) Plaintiff was forced to file for bankruptcy in April 1995 and is currently receiving public aid. According to Plaintiff, Defendant has "even sabotaged Plaintiff's AFDC benefits." (*Id.*) (She does not explain how Defendant has done so). (*Id.* at 25.) Plaintiff believes that Defendant caused her to become an AFDC recipient in order to make it appear that she is "an incompetent, uneducated, or crazy person ...." (*Id.* at 28.) Similarly, she claims that Defendant directed Excel Employment Services to "ha[ve] Plaintiff's unemployment compensation benefits denied" because Plaintiff would not submit to Defendant. (*Id.* at 28.) Finally, Plaintiff claims that her own family "assisted in the oppression and termination of the Plaintiff"; that her skin has been burned "as a result of the Defendant's direction to lace Plaintiff's facial cosmetics with a chemical"; that she lacks medical or dental insurance; and that every black man Plaintiff has dated "has been turned against the Plaintiff by the direction of the Defendant ...." (*Id.* at 26.)

As in her other answers, Plaintiff identifies Spark Easterling and Eddie Turner Blackman as culprits. She claims that she is being stalked by Ms. Easterling and Mr. Blackman (*Id.* at 25); that Mr. Blackman has been "sleeping with Plaintiff's employer in Gary, Indiana ... and as a result Plaintiff was terminated from that place of employment" (*Id.* at 28); and that Mr. Blackman married Ms. Easterling in order to harass her. (*Id.*

at 25.) Plaintiff claims that Mr. Blackman assisted Ms. Easterling in performing witchcraft against her. (*Id.* at 26.) As an example of this assistance, Plaintiff reports that "during one of the last sexual encounters I had with him after the December 1991 Christmas Party, he put onions in the bed, apparently some form of witchcraft that Spark Easterling had directed him to do ...." (*Id.*) Apart from her unsupported allegations of a conspiracy, however, Plaintiff does not explain how any such harassment by Ms. Easterling (a former employee) and Mr. Blackman (never an employee of the firm) can give rise to liability on the part of Defendant.

Plaintiff's answers to these Interrogatories indicate that she has no factual basis for her assertions concerning Defendant's conduct beyond her own speculation. Again, apart from her imagination, she offers nothing to suggest Defendant is responsible for Mr. Blackman's conduct in placing onions in the bed, marrying Ms. Easterling, sleeping with her Gary, Indiana employer, or stalking her. Nor does she provide any specific facts or circumstances to support her allegations that Defendant "directed" that her cosmetics be adulterated, "directed" difficulties in her romantic relationships, "sabotaged" her receipt of AFDC or unemployment compensation benefits, or awarded "points and gratuities" to persons willing to harass her. Although she suspects some kind of vendetta, she offers no basis upon which a law firm, presumably engaged in the practice of law on behalf of clients, would have any motivation to engage in such efforts. Before being required to answer such allegations, Defendant is entitled to know the names of the persons who allegedly gave such directions, the circumstances and dates on which such directions were given, the persons present, *etc.* Defendant's Interrogatories sought these specifics. Plaintiff did not provide them in her answers, nor was she able to provide them in response to the court's questions at the conference on November 7, 1996. This court concludes that her "oppression" and "harassment" allegations should also be dismissed.

## CONCLUSION

In *Sakovich v. City of Kankakee*, 130 F.R.D. 394 (C.D.Ill.1990), the district court concluded that the plaintiff's allegations of abuse by court officials, physicians, dentists, and hospitals were "patently frivolous" and "driven by [her] paranoid delusions." *Id.* at 396. Invoking the policy of FED. R. CIV. P. 16, the court concluded that the complaint should be dismissed as frivolous, even before defendants were served with process. *Id.* at 397. *See also Besecker v. Boyl,* 9 F.3d 112 (Table) (Text in WESTLAW), 1993 WL 393129 (7th Cir. Oct.6, 1993) (affirming dismissal of allegations that defendant police officer insulted, slandered and "smacked" him at the request of an examining psychologist); *Frey v. Board of Regents of Univ. of Wisconsin Sys.,* No. 95 C 4996, 1995 WL 557446 (N.D.Ill. Sept.19, 1995) (Hart, J.) (dismissing allegations of conspiracy involving efforts of Japanese gangsters to force female students of defendant university into prostitution); *McCorkle v. Ameritech,* No. 93 C 7353, 1993 WL 524703 (N.D.Ill.Dec.13, 1993) (Shadur, J.) (dismissing allegations that Illinois Bell, public aid officials, and the United States Navy had employed gang members to harass plaintiff by means of "a bad body odor" and efforts to "make me into and [sic] old lesbian").

Having reviewed Plaintiff Minnis' complaint and interrogatory answers, and having heard her testimony, this court concludes that her claims do not meet even the low burden imposed by § 1915(d). The complaint should be dismissed.

For the same reasons, Plaintiff has not established any basis for entry of a temporary restraining order or preliminary injunction. Her motion for such relief should be denied. Her motion to strike Defendant's motion to dismiss should also be denied.

March 5, 1997.

Defendant's motion to stay discovery should be denied as moot, as should Plaintiff's motion to strike that motion. Finally, Plaintiff's motion to compel Defendant to respond to discovery requests, as well as her motion to compel the mental examination of fifteen persons, should be denied.

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Paul E. Plunkett. *See* FED. R. CIV. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Lorentzen v. Anderson Pest Control,* 64 F.3d 327, 330 (7th Cir.1995).