**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 11 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FRANCES TURNER,

      Plaintiff-Appellant,

v.

REYNOLDS FORD, INC.;
TOM MCKEE, an individual,

      Defendants-Appellees.

No. 97-6152
(D.C. No. CIV-96-319-T)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **McKAY**, and **BRISCOE**, Circuit Judges.

---

      After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Plaintiff Frances Turner brought this action asserting claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964 against Reynolds Ford, Inc., her former employer, and asserting several Oklahoma state law claims against Reynolds Ford and her former coworker, Tom McKee. The district court granted summary judgment on all of plaintiff's claims against Reynolds Ford and subsequently denied plaintiff's motion for reconsideration. It then declined to exercise supplemental jurisdiction over the claims against McKee, and dismissed them without prejudice. Plaintiff appeals. We affirm in part, reverse in part, and remand for further proceedings.

I.

Because the district court resolved plaintiff's claims in favor of Reynolds Ford on summary judgment, we present the facts in the light most favorable to plaintiff. Plaintiff began working at Reynolds Ford, an automobile dealership, in September 1993 and became a salesperson in April 1994. Dale Daniels, a part-owner and general manager of Reynolds Ford, was responsible for employment matters including hiring, supervising and terminating employees, and he had general supervisory responsibilities over plaintiff.

When she became a salesperson, plaintiff began sharing an office cubicle with defendant McKee, another salesperson who did not have supervisory authority over her. In August 1994, plaintiff and McKee began a brief sexual

relationship which ended in early September. Plaintiff and McKee maintained their friendship, and McKee continued to visit plaintiff at her home. At some point, plaintiff decided to terminate her relationship with McKee, but he became intimidating and controlling. On October 15, 1994, he followed her to her home very early in the morning, and assaulted, battered and raped her. She did not report this incident to the police at this time.

On October 19, plaintiff told Daniels that she had been having personal problems with McKee and that he had become obsessive with her. She also told him that during an incident that occurred away from work, they had argued, and McKee had grabbed her and slapped her, and then apologized. Plaintiff showed Daniels a bruise on her arm that McKee gave her, but told him that her relationship with McKee was purely platonic; she did not mention the rape or her prior sexual relationship with McKee. Daniels told plaintiff that sexual harassment would not be tolerated by Reynolds Ford, and he offered to talk to McKee about plaintiff's allegations, but plaintiff insisted that he not discuss the matter with McKee. Plaintiff and Daniels agreed that she should be moved to another desk so that she and McKee would be separated at work, but plaintiff did not want anyone to know the reason for the move. They planned to move her desk the following Monday, October 24, and to tell people that the move was to help plaintiff and McKee be more productive.

Plaintiff did not go to work that Monday, but she did go the next day, October 25, and met with Daniels. She told him that on the day before, McKee had followed her on two occasions, once in his car and once in a store. In the store, he threatened her. She also told Daniels that as she was walking into work that day, she had run into McKee and they exchanged harsh words, with McKee threatening to ruin her name. McKee then began talking to another coworker whom plaintiff had previously dated, and while plaintiff could not hear what McKee said to the other employee, she felt that McKee was telling lies about her. In response to these statements by plaintiff, Daniels said that he would call McKee into his office immediately to discuss the matter. Plaintiff told Daniels that she would make it easy on him and quit. Although plaintiff had been advised that her desk was to be relocated as previously planned, she quit before the move was accomplished.

Later that day, Daniels called McKee into his office along with McKee's direct supervisor, and counseled and reprimanded him with respect to plaintiff's allegations. He also gave McKee a written warning stating "[t]his warning pertains to allegations of sexual harassment. Such conduct is unacceptable. Continuation of such conduct will result in immediate dismissal." Appellant's App. Vol. 1 at 257. During this meeting McKee claimed plaintiff was the one doing the harassing by following him around and trying to talk to him. He also

stated that he had had a romantic relationship with plaintiff, but that it had ended. See id. at 255.

The next day, plaintiff filed criminal assault and battery charges against McKee relating to the incident on October 15. The charges did not include a rape charge, but her description of the incident portrayed a much more abusive and threatening situation than the incident plaintiff had described to Daniels on October 19.

On October 27, Daniels called plaintiff and told her that McKee had been given a written disciplinary warning and that she was welcome to return to her job. Dick Reynolds, the owner of Reynolds Ford, also encouraged her to return. On November 8, she returned to work and was given a disciplinary warning similar to the one McKee had been given, based on his allegation that she was harassing him. On November 10, she again complained to Daniels that McKee had been following her around the workplace and trying to talk to her. In response, Daniels met with both plaintiff and McKee and counseled them not to deal with each other at work on any matter not related to business. Plaintiff testified in her deposition that she was not critical of the way Reynolds Ford handled the situation between her and McKee up to the time of the November 10 meeting.

On November 21, while he was at work, McKee was served with papers regarding plaintiff's criminal charges against him. That same day, plaintiff reported to Daniels that McKee had followed her around at work trying to discuss the charges with her. On hearing this, Daniels called plaintiff, McKee and McKee's supervisor into his office and again told plaintiff and McKee to limit their communications with each other at work to business-related matters. Daniels and McKee's supervisor also met separately with McKee that day to discuss plaintiff's allegations that he was harassing her. He admitted that he had been trying to talk to her about the charges she had filed. Plaintiff did not report any other workplace incidents between herself and McKee, nor were any observed.[1]

In September and October 1994, plaintiff and Daniels had discussed plaintiff's sales performance, which neither was satisfied with. Plaintiff was concerned that she could be terminated for poor performance. On November 30,

---

[1]    Plaintiff also contends that McKee spread vicious rumors about her at work that she abused drugs, was a witch and engaged in prostitution. The evidentiary support for this was plaintiff's testimony regarding what a female coworker had told her that the coworker had heard McKee say. The district court stated that "[t]o the extent this evidence does not constitute inadmissible hearsay, it is too vague and general to establish a sexually hostile work environment." Appellant's App. Vol. 2 at 664 n.16. We conclude that the evidence is inadmissible hearsay, see Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1542 (10th Cir. 1995), and decline to consider it.

Daniels terminated plaintiff's employment, the stated reason being poor sales performance.

Plaintiff brought this action asserting against Reynolds Ford federal law claims of sexual harassment for hostile work environment and retaliatory discharge in violation of Title VII, and state law claims of sexual harassment, retaliatory discharge and intentional infliction of emotional distress. Against McKee, she asserted claims of assault and battery and intentional infliction of emotional distress. Reynolds Ford moved for summary judgment on all claims, which the district court granted. It concluded that McKee's acts, considered in light of what information was made available to Reynolds Ford, were not of the type or quantity to constitute actionable sexual harassment, and even if they were, Reynolds Ford took adequate remedial action. The court held that plaintiff's Title VII retaliation claim fell because she could not prove a causal connection between her termination and her complaints of sexual harassment. As to her state law claims, the court held that her sexual harassment claim was not recognized under Oklahoma law, that her failure to prove retaliation under Title VII also foreclosed her retaliatory discharge claim, and that Reynolds Ford's conduct was not outrageous enough to support her claim for intentional infliction of emotional distress.

Plaintiff moved for reconsideration, arguing most importantly for this appeal, that the district court had failed to consider the affidavit of Dan Huff, a former Reynolds Ford manager. After she had filed her response to Reynolds Ford's summary judgment motion, plaintiff had submitted Huff's affidavit attached to a document titled "Motion to include witness concealed by Reynolds Ford," in which she requested the court to add Huff's name to the trial witness list and to supplement her summary judgment response with his affidavit. In denying the motion for reconsideration, the court refused to consider the Huff affidavit because it concluded plaintiff had not properly brought it to the court's attention prior to the court's ruling on summary judgment. The court subsequently dismissed plaintiff's state law claims against McKee under 28 U.S.C. § 1367(c)(3) and entered final judgment.

On appeal, plaintiff contends that the district court erred by (1) concluding that she had not presented sufficient evidence of a hostile work environment; (2) concluding that Reynolds Ford had adequately investigated her complaints and had taken adequate remedial action; (3) refusing to consider the Huff affidavit; (4) finding that Reynolds Ford's stated reason for terminating her was not

pretextual and rejecting her retaliation claim; and (5) rejecting her state law claims for retaliation and infliction of emotional distress against Reynolds Ford.[2]

## II.

We review the district court's grant of summary judgment de novo, and apply the same standard the district court applied under Fed. R. Civ. P. 56(c). See Frank v. U.S. West, Inc., 3 F.3d 1357, 1361 (10th Cir. 1993). Summary judgment is appropriate if there are no genuine factual disputes and the moving party is entitled to judgment as a matter of law. See id.; Rule 56(c). Viewing the facts in the light most favorable to the nonmoving party, we must determine whether the evidence could support a jury verdict for the nonmoving party. See Black v. Baker Oil Tools, Inc., 107 F.3d 1457, 1460 (10th Cir. 1997); Frank, 3 F.3d at 1361. Summary judgment may be granted if the evidence is not significantly probative, but is merely colorable. See id.

---

[2] In the statement of issues contained in her opening brief, plaintiff also listed as an issue her contention that the district court erred by declining to exercise supplemental jurisdiction over her state law claims against McKee. However, she never mentioned this issue again and failed to present any argument if support of it. We therefore will not consider this issue, see Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir.1990), and affirm the court's dismissal of the claims against McKee.

A. Title VII sexual harassment claim

Plaintiff's Title VII sexual harassment claim is based on the allegedly sexually hostile work environment she claims she was forced to endure at Reynolds Ford. An actionable hostile work environment claim under Title VII exists "where '[sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.'" Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 575 (10th Cir. 1990) (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986)) (further quotation omitted). Title VII prohibits a workplace that is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65, 67). Determining whether a work environment is sufficiently hostile or abusive to be actionable requires consideration of all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. An employer may be liable for illegal harassment by its employees under agency principles. See Harrison v. Eddy Potash, Inc., 112 F.3d

1437, 1443-46 (10th Cir.), petition for cert. filed, 66 U.S.L.W. 3137 (U.S. Aug. 6, 1997) (No. 97-232). The only agency principle applicable here requires plaintiff to show that Reynolds Ford "knew about, or should have known about, the harassment and failed to respond in a reasonable manner." Id. at 1446.[3]

We agree with the district court that considering all the circumstances of which Reynolds Ford was or should have been aware and its response to plaintiff's complaints, plaintiff has not demonstrated that she was subjected to a hostile work environment for which Reynolds Ford can be liable. The most that can be said for plaintiff's workplace environment is that McKee at times followed her around, tried to talk to her and exchanged harsh words with her. She was subjected to no overtly sexually related conduct at work.[4] While McKee's actions

---

[3]     Plaintiff also contends that Reynolds Ford can also be liable under the agency principle providing that "the employer can become liable for sex harassment where the harasser is aided by the delegated discretion implicit in his employment relationship to engage in the harassment." Appellant's Reply Br. at 1; see also Harrison, 112 F.3d at 1446. This principle does not apply here because there is no evidence that McKee's agency relationship with Reynolds Ford provided him with anything more than physical proximity to plaintiff, which is insufficient for employer liability to attach. See id.

[4]     Reynolds Ford contends that McKee's conduct for which plaintiff seeks to hold it liable is "gender neutral" and not *sexual* harassment in the first place, thus making the severity and pervasiveness of the conduct irrelevant for Title VII purposes. "Sexual harassment is behavior that would not occur but for the sex of the employee. . . . If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination." Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir. 1996) (internal quotations omitted). McKee's actions at work were not overtly

(continued...)

-11-

at work may have been unpleasant, they simply were not severe or pervasive enough to create a hostile environment actionable under Title VII.

Most of plaintiff's argument regarding the hostility of her work environment is based on McKee's harassment of her outside of work, and she contends that Reynolds Ford should be liable for failing to conduct an adequate investigation into these off-site activities.[5] Plaintiff was obviously well aware of what was going on between her and McKee outside of work, and she deliberately chose not to report those activities to Reynolds Ford. While an employer may have a duty to adequately investigate allegations of sexual harassment, the subject of the harassment has the duty in the first instance to be forthcoming regarding the extent of the harassment. Plaintiff cannot rely on the employer's duty to investigate to shift that burden to Reynolds Ford.

_____

[4](...continued)
sexual and could be seen as gender neutral, cf. id. (noting incidents of gender-neutral activity, including invading plaintiff's desk, blocking doors, spiking her drink), but they stemmed from the failed sexual relationship between plaintiff and himself. However, because we conclude that even if McKee's actions are not gender neutral, plaintiff has failed to show a hostile working environment, we need not decide whether his actions constituted harassment based on sex.

[5]     Plaintiff also contends that Reynolds Ford should have interviewed other employees to further investigate the situation. However, we are left to speculate what evidence such an investigation would have uncovered. Plaintiff has identified no evidence indicating that other employees were aware of the situation or corroborating plaintiff's reports of McKee's harassing conduct.

Moreover, the issue "is not whether the investigation was adequate . . . but rather whether the remedial action was adequate." Knabe v. Boury Corp., 114 F.3d 407, 412 (3d Cir. 1997). Plaintiff contends that Reynolds Ford's remedial actions were inadequate because McKee's harassing conduct continued after she first complained to Daniels about it.

Remedial action is adequate if it is "reasonably calculated to prevent further harassment." Id.; see also McKenzie v. Illinois Dep't of Trans., 92 F.3d 473, 480 (7th Cir. 1996). We agree with the district court that Reynolds Ford's remedial action here was adequate. After plaintiff's first complaint, when she explicitly told Daniels she did not want him to talk to McKee, Daniels agreed to separate plaintiff's desk from McKee's. After her second complaint, Daniels counseled McKee and gave him a written warning. After her third complaint, which followed McKee's statement that she had been harassing him, Daniels met with both of them and told them not to deal with each other at work except on work-related business. The only other incident at work occurred on the day McKee was served with the criminal charges and he tried to talk to plaintiff about them. The fact that Daniels' remedial actions were not immediately successful does not necessarily mean that they were inadequate. See id. (issue is not "whether the remedial activity ultimately succeeded, but instead . . . whether the employer's total response was reasonable under the circumstances") (internal

-13-

quotation omitted). Given the limited amount of at-work harassment and plaintiff's failure to fully disclose her relationship with McKee, it would not be reasonable to expect Reynolds Ford to have terminated McKee, as plaintiff contends. See Hirschfeld, 916 F.2d at 578 n.6 (noting that type of remedial action appropriate depends on gravity of situation); McKenzie, 92 F.3d at 481. We conclude that Reynolds Ford's remedial actions were adequate and that plaintiff has not met her burden of showing a hostile work environment.

B. Title VII retaliation

Plaintiff submitted the Huff affidavit as evidence that Reynolds Ford's stated reasons for firing her were pretextual. Therefore, before addressing the merits of her retaliation claim, we must first determine whether the district court erred by refusing to consider the affidavit. We conclude it did.

1. District court's refusal to consider the Huff affidavit

Plaintiff and Reynolds Ford completed their briefing on Reynolds Ford's summary judgment motion on December 11, 1996, and trial was set for January 13, 1997. On January 3, plaintiff filed her "Motion to include witness concealed by Reynolds Ford," in which plaintiff contended that she first became aware around December 18 that Dan Huff, Reynolds Ford's former body shop manager, had knowledge relevant to her case. Plaintiff attached Huff's affidavit

-14-

to her motion and requested that the court allow her to add Huff to her final trial witness list and to supplement her summary judgment response with Huff's affidavit, identifying the particular factual paragraph of Reynolds Ford's summary judgment motion which she contended the affidavit refuted.  At some point, the trial was postponed.  Reynolds Ford responded to the motion on January 21, objecting to both Huff's inclusion on the trial witness list and the supplementation of plaintiff's summary judgment response with his affidavit.  On January 28, plaintiff filed a motion to file a reply brief.  In granting that motion, the district court noted that the reply brief would be "in support of her January 3, 1997 motion (i) to add Dan Huff as a trial witness, and (ii) to supplement her response to defendant Reynolds Ford's November 1, 1996 summary judgment motion."  Appellant's App. Vol. 2 at 568.  However, while the court acknowledged that plaintiff had moved to supplement her summary judgment response, the court never addressed that motion.  It granted summary judgment to Reynolds Ford on April 2 without reference to the Huff affidavit.

Plaintiff then filed a motion for reconsideration of the court's summary judgment ruling partially based on the court's failure to consider the Huff affidavit.  In denying the motion, the court stated:

> The plaintiff seeks to have the court consider the affidavit of Dan Huff, yet fails to explain why she waited until after the court had issued its decision on the pending [summary judgment] motion to submit his testimony.  She notes in her brief that Mr. Huff's affidavit

was attached to a "Motion to Include Witness Concealed by Reynolds Ford," which was filed on January 3, 1997. In that pleading the plaintiff stated that her attorney "first learned about the fact that Dan Huff had such relevant information a day or two before December 18, 1996." Although this was subsequent to the date the plaintiff responded to Reynold[s] Ford's motion for summary judgment, she could have sought leave to supplement her response brief and include Huff's affidavit, and her request would have been readily granted.

The court cannot be expected to search the record and review every pleading to discern if there is some evidence somewhere in the court file that might support a party's claim.

. . . .

Having expended considerable time reviewing the parties' evidence and arguments, the court cannot permit its attention to be diverted from other cases to which it now has turned its attention, because the plaintiff did not do a thorough job the first time and wants a second opportunity. The plaintiff's proffer of additional evidence, which could have been provided to the court in a timely manner, is too late and will not be considered.

Id. at 695-96 (footnotes omitted). As can be seen, the court was mistaken in stating that plaintiff failed to seek leave to supplement her summary judgment response. Admittedly, plaintiff could and should have done a much better job of presenting the matter to the court; indeed, it seems unwise to have emphasized her motion to supplement her list of trial witnesses rather than her summary judgment response when the possibility of never getting to trial was still looming. Nonetheless, taking her statement regarding when she first learned Huff had relevant information at face value, she timely presented her motion to supplement.

-16-

Moreover, the court had acknowledged the outstanding motion to supplement plaintiff's summary judgment response two months before it ruled on the summary judgment motion.

Whether to allow a party to supplement a summary judgment response is ordinarily subject to the trial court's discretion. See Maier v. Lucent Techs., Inc., 120 F.3d 730, 735 (7th Cir. 1997).[6] We could remand the matter to the district court for it to determine in the first instance whether to allow plaintiff to supplement her response, but we conclude that that would be a waste of judicial resources. The district court already stated it would have granted plaintiff's motion had it been raised timely, and it was simply mistaken in viewing the motion as untimely. Moreover, in opposing plaintiff's motion, Reynolds Ford presented no compelling reason why plaintiff should not be allowed to supplement her response. We therefore will consider the Huff affidavit in analyzing plaintiff's retaliation claim.

---

[6]     Plaintiff essentially renewed her motion to supplement in her motion for reconsideration, which she filed prior to entry of judgment. We also review the district court's denial of that motion for abuse of discretion. Cf. Elsken v. Network Multi-Family Sec. Corp., 49 F.3d 1470, 1476 (10th Cir. 1995) (addressing post-judgment motion for reconsideration).

## 2. Merits of retaliation claim

To establish a retaliation claim under Title VII, a plaintiff initially must establish a prima facie case by showing "(1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action." Berry v. Stevinson Chevrolet, 74 F.3d 980, 985 (10th Cir.1996). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir. 1982). The district court held that plaintiff failed to show the third element because the only evidence on this point was the close temporal proximity between plaintiff's complaints about McKee and her termination. Alternatively, the court found that even assuming plaintiff established a prima facie case, Reynolds Ford articulated a legitimate business reason--plaintiff's poor sales performance--for terminating her and plaintiff did not show that reason was pretextual. See generally Berry, 74 F.3d at 985-86 (describing analytical framework for Title VII claims). Plaintiff contends that she made an adequate

showing both of the causal connection between her protected activity[7] and termination and of pretext.

The time from when plaintiff first began complaining about McKee's harassment to her termination was only six weeks, and her last complaint was only ten days prior to her termination. This close temporal proximity between her complaints and her discharge justifies an inference of retaliatory motive. See Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir.1994) (holding evidence of adverse employment actions a month and a half after engaging in protected activity to be circumstantial evidence of retaliation); see also Marx v. Schnuck Markets, Inc. 76 F.3d 324, 326, 329 (10th Cir.), cert. denied, 116 S. Ct. 2552 (1996); Burrus, 683 F.2d at 343. Thus, we conclude that plaintiff met her burden of establishing a prima facie case of retaliation.

At this point, the burden shifts to Reynolds Ford to state a legitimate reason for its decision to terminate plaintiff. See Berry, 74 F.3d at 986. It contends that it terminated her because of her poor sales performance.[8] We agree with the

---

[7]    Reynolds Ford does not challenge on appeal the district court's implicit conclusion that plaintiff's complaints comprised protected opposition to Title VII discrimination.

[8]    Reynolds Ford contends that plaintiff was also terminated because of her poor attitude. However, when she was fired, plaintiff said that the only thing Daniels told her was that "it's a numbers game." Appellant's App. Vol. 1 at 181. Moreover, Daniels testified that "[y]ou've got to have the numbers. You've got to have the sales. If you can't sell, you can't stay." Id. at 226. He agreed that
(continued...)

-19-

district court that her poor sales performance is a legitimate, non-discriminatory reason for terminating plaintiff, thus requiring her to produce evidence that this reason was pretextual. See id. As evidence of pretext, plaintiff points to (1) the Huff affidavit, and (2) the fact that Reynolds Ford did not terminate other salespersons whose sales records also failed to meet Reynolds Ford's requirements.

In his affidavit, Huff stated as follows:

> I was manager of the body shop at Reynold [sic] Ford from on or about November, 1991 to on or about June, 1996.

> I regularly attended management meetings at Reynolds Ford during my employment. I attended a management meeting which discussed Frances Turner. The meeting was attended by Mr. Dick Reynolds, Mr. Dale Daniels and other managers. At the meeting, Mr. Reynolds stated that due to potential legal problems that could occur with Frances Turner, he was prepared to fight any charges with all his resources, and the Court Clerk would suppress any filings in the District Court as long as possible in order to keep it out of the newspapers. After the meeting I inquired of Mr. Reynolds as to why they did not address the situation by terminating Tom McKee, since it was my opinion that he was the problem, and Mr. Reynolds responded that for legal reasons Reynolds Ford needed to keep him on and that management would deal with Frances Turner now and then deal with Tom McKee on down the line. On another occasion, prior to Frances Turner's termination by Reynolds Ford, I asked Mr. Reynolds why they did not fire Tom McKee and keep Frances

---

[8](...continued)
sales performance was the "bottom line." Id. Viewing the evidence in plaintiff's favor, it is clear that sales performance was the critical factor in plaintiff's termination.

Turner, and Mr. Reynolds replied that Tom McKee was still selling cars and Frances Turner was not doing as well.

A couple of weeks after Frances Turner returned to work in November of 1994, Frances Turner approached me and stated that she was not receiving any help or support from Dale Daniels and asked if there was the possibility that she could transfer into the body shop. Subsequently, I had a meeting in Dale Daniels' office to discuss the transfer possibilities with Dale Daniels. He explained to me that they did not want any transfers to occur and they were going to let her employment run its course. They explained that they had hired her back only because they could not let her leave under the circumstances and that they wanted her to be "on" for awhile but that they had ways to affect her quotas and units sold such that she would not be able to meet her salary draw and they would terminate her at that time.

Appellant's App. Vol. 2 at 502.

An employee may show pretext by producing evidence that other employees whose performance would also have provided legitimate reasons for their termination or other adverse action, but who did not engage in the protected activity, were not subject to adverse action. See Delli Santi v. CNA Ins. Cos. 88 F.3d 192, 203-04 (3d Cir. 1996); Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 770 (7th Cir. 1994). Reynolds Ford's stated policy is that salespersons are required to sell an average of ten vehicles a month. During the seven months from May to November 1994 that plaintiff was a salesperson, her monthly unit

-21-

sales were 10, 3, 6, 6.5, 10.5, 5 and 3, for a monthly average of 6.29.[9] See Appellant's App. Vol. 2 at 378. Of the eighteen other salespersons who worked more than two months during that same period, plaintiff's average was the lowest. However, nine of these other salespersons' averages were below the ten-unit requirement. One employee's average was 7.5, and he sold only eight vehicles in October and three in November. Another employee's average was 7.64, and she sold nine vehicles in October but only two in November. None of these other employees was terminated for poor sales performance.

We conclude that plaintiff met her burden of showing Reynolds Ford's stated reasons for terminating her were pretextual. Huff's affidavit indicates that plaintiff was not fired for insufficient sales and that Reynolds Ford was concerned about "charges" plaintiff could bring, presumably, sexual harassment charges, and how bad it would look that plaintiff quit immediately after complaining about McKee's conduct. While her sales performance was the lowest of the salespersons, it was not much lower than others who also failed to meet Reynolds Ford's "requirement" of ten sales a month, but who were not fired. And the Huff affidavit indicates that Reynolds Ford could limit her sales so she would be unable to meet the sales requirement, thus providing an excuse for firing her.

---

[9] As noted earlier, plaintiff had quit on October 25 and did not return to work until November 8.

-22-

This evidence raises a legitimate factual dispute regarding the reason for plaintiff's termination. We therefore reverse the district court's grant of summary judgment on the Title VII retaliation claim.

## C. State law retaliation claim

Plaintiff claims that her termination violated Oklahoma public policy and that she stated a cause of action for retaliatory discharge under Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989). In the district court, plaintiff based her Burk claim on her contentions that Reynolds Ford terminated her in retaliation for her complaints of sexual harassment and her filing of criminal charges against McKee. The district court found that plaintiff had not presented evidence showing that Reynolds Ford had discharged her for either of these reasons and denied her claim, noting that it did not have to decide whether a discharge for these reasons would be actionable under Burk. See Appellant's App. Vol. 2 at 665 & n.19. On appeal, plaintiff pursues only her claim that she was improperly discharged for filing criminal charges against McKee.[10]

---

[10] Plaintiff appears to concede that because Title VII provides an alternate statutory remedy for discharges in retaliation for complaining of sexual harassment, Oklahoma would not recognize a Burk claim for the same conduct. See Appellant's Br. at 47-48 (citing List v. Anchor Paint Mfg. Co., 910 P.2d 1011, 1015 (Okla. 1996)).

-23-

In <u>Burk</u>, the Oklahoma Supreme Court

carved out an exception to the long-standing rule that an employment contract of indefinite duration is terminable by either the employer or the employee at anytime. The terminable at-will doctrine acknowledges that an employer may discharge an employee for good cause, for no cause or for cause morally wrong, without bearing any legal responsibility. The exception recognizes that under certain circumstances the employer has committed a wrong against the employee and society at large when the employee is discharged for doing that which is right or refusing to do that which is wrong.

<u>Marshall v. OK Rental & Leasing, Inc.</u>, 939 P.2d 1116, 1119 (Okla. 1997).

The court has emphasized, however, that the exception applies only "'in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law. . . . In light of the vague meaning of the term public policy we believe the public policy exception must be tightly circumscribed." <u>Id.</u> (quoting <u>Burk</u>, 770 P.2d at 28-29).[11]

---

[11]    Oklahoma courts have identified five public-policy areas in which wrongful-dismissal claims may be actionable:

an employee's discharge for (1) refusal to participate in an illegal activity; (2) performance of an important public obligation; (3) *exercise of a legal right or interest*; (4) exposure of some wrongdoing by the employer; and (5) performance of an act that public policy would encourage or refusal to do something that public policy would condemn, when the discharge is coupled with a showing of bad faith, malice or retaliation.

<u>Groce v. Foster</u>, 880 P.2d 902, 904-05 (Okla. 1994) (citing <u>Hinson v. Cameron</u>,

(continued...)

Plaintiff contends that "[r]eporting crime in good faith and with a reasonable basis in fact, is an essential part of law enforcement and should be encouraged by the public policy of every state," Appellant's Br. at 48, and that firing her for filing criminal charges against her coworker McKee thus violates a clear mandate of public policy. Plaintiff relies heavily on Palmateer v. International Harvester Co., 421 N.E.2d 876 (Ill. 1981), a case cited in Burk for general principles regarding the public policy exception. Palmateer holds that terminating an employee for reporting a coworker's possible criminal conduct to law enforcement officials violated public policy and stated a claim under the exception to the employment at-will doctrine. The court stated that public policy favored the reporting of the possibility of a crime to law enforcement agencies, see id. at 880, noting that "[t]here is no public policy more basic, nothing more implicit in the concept of ordered liberty, than the enforcement of a State's criminal code." Id. at 879 (citation omitted).

Oklahoma has rejected the broad construction of the exception provided by the Illinois court in Palmateer, which appears to have held that the reporting of

---

[11](...continued)
742 P.2d 549, 552-53 (Okla. 1987)).

any type of crime was protected.[12]  In Hayes v. Eateries, Inc., 905 P.2d 778 (Okla.

1995), the court stated that

> [a]lthough we believe most people, including the members of
> this Court, would agree that generally speaking, the reporting of
> crimes to appropriate law enforcement officials should be lauded and
> encouraged, . . . we must decide in this case whether the **reporting**
> of this **particular** crime against this **particular** victim . . . is so
> imbued with a clear and compelling public policy such that a tort
> claim is stated if the employer discharges the employee for so
> reporting.

Id. at 786.  In Hayes, the particular crime was embezzlement, and the particular

victim was the plaintiff's employer.  The plaintiff asserted he was wrongfully

discharged in retaliation for reporting and investigating this crime by his

supervisor.[13]  The court rejected plaintiff's claim because he was not the victim

and embezzlement was not the appropriate crime.  "[I]t is not up to an individual

employee to report to outside law enforcement agencies embezzlement **from his**

**employer by a co-employee, but it is up to the employer who is the direct**

**victim of the crime**."  Id. at 787.  Because the plaintiff was not the direct victim

---

[12]    Even though the actual crime that the plaintiff had reported was not set
forth in the complaint, the court held that the plaintiff stated a cause of action.
See Palmateer, 421 N.E.2d at 880.

[13]    It was unclear from the plaintiff's complaint whether he had reported the
suspected crime externally to law enforcement officials or internally to company
officials, but the court stated that its analysis applied in either event.  See Hayes,
905 P.2d at 785-86.

of the crime he had reported, he was "not exercising any legal right or interest of his own." Id. at 786. Additionally, by reporting embezzlement against his employer, the plaintiff

> is not seeking to vindicate a public wrong where the victim of the crime could in any real or direct sense be said to be the general public, as where crimes or violations of health or safety laws are involved. Thus, the situation here must also be distinguished from those where sister jurisdictions have protected "whistleblowing" activity geared toward the good faith reporting of infractions by the employer or co-employees of rules, regulations or the law pertaining to the **public** health, safety or general welfare.

Id. Thus, plaintiff's contention that the reporting of *any* crime falls within the protection of the public policy exception is incorrect. Whether reporting criminal activity falls within the public policy exception depends on who the victim is and what the crime is.

Here, plaintiff's claim clearly meets the first factor--she was the direct victim of the assault and battery. Reynolds Ford essentially contends that the assault and battery here is not the appropriate crime to fall within the exception because it is too attenuated from the workplace, citing Pearson v. Hope Lumber & Supply Co., 820 P.2d 443, 445 (Okla. 1991) (rejecting claim that Polygraph Examiners Act provided "'clear mandate of public policy' . . . because the Act does not purport to touch any aspect of the employment relationship"). We note that Hayes gives two examples of protected activity where the employee was

seeking to vindicate his own rights or interests, and both were closely associated with the workplace.  See 905 P.2d at 786.

However, in Smith v. Farmers Cooperative Association, 825 P.2d 1323 (Okla. 1992), the court held that the plaintiff stated a Burk claim where the public policy being encouraged was not directly associated with the workplace.  The plaintiff in Smith was an employee of the Cooperative and also town mayor and a member of the town board of trustees, which ruled on requests for zoning variances.  One of the Cooperative's board members, Baker, wanted to obtain a zoning variance that apparently was unrelated to the Cooperative's business, and he spoke to plaintiff about obtaining a variance.  The town board subsequently denied Baker's request, and shortly thereafter, the plaintiff was fired from his position at the Cooperative.  He then filed a Burk claim alleging he was wrongfully fired for acting consistent with public policy.  The court agreed he stated a Burk claim, finding the applicable public policy in the statute providing for the general zoning power of municipalities.  "Under Burk . . . , if [plaintiff] were fired for performing an act consistent with public policy such as administering the town's zoning laws while acting in his capacity as mayor and a voting member of the town's board of trustees, he would have an actionable tort claim."  825 P.2d at 1326.

In light of <u>Hayes</u> and <u>Smith</u>, we conclude that plaintiff's filing criminal charges against McKee was activity protected by the public policy exception. Plaintiff was the direct victim of the crime; if she did not report it, it is unlikely anyone else would. Under <u>Smith</u>, the fact that the criminal activity was not associated with the workplace does not defeat plaintiff's claim, though as we discuss below, it may make the causation requirement for a retaliatory discharge action more difficult. And we think the type of crime--assault and battery--fits the <u>Hayes</u> analysis because it involves public safety and is thus much more of a wrong against the general public than the invasion of "private or proprietary" interests involved in <u>Hayes</u>, 905 P.2d at 787. We therefore conclude that plaintiff stated a valid <u>Burk</u> claim, and turn to whether plaintiff has shown an adequate causal relationship between her reporting the crime and her termination.[14]

The district court held that plaintiff had not adduced any evidence that Reynolds Ford fired her because she had filed criminal charges against McKee. The causation issue here is a closer question than for the Title VII retaliation claim. Obviously, plaintiff's termination closely followed the protected activity relevant to both claims. But the protected activity involved in the Title VII claim-

---

[14] Oklahoma courts have applied the Title VII burden-shifting rules rules in other retaliatory discharge cases, <u>see, e.g.</u>, <u>Buckner v. General Motors Corp.</u>, 760 P.2d 803, 806 (Okla. 1988), although we are unaware of any cases applying them to <u>Burk</u> claims.

-29-

-reports of sexual harassment in the workplace made to Daniels--directly involved Reynolds Ford; the report of assault and battery to law enforcement officials did not. Thus, the inference of retaliatory motive that can be drawn from the timing of the discharge does not appear as strong for plaintiff's Burk claim. But Reynolds Ford did know that plaintiff filed the criminal complaint, and her action did disrupt the workplace. When McKee was served with the charges at work, he tried to talk to plaintiff, plaintiff complained to Daniels, and Daniels had to counsel both parties. Plaintiff testified that Daniels told her that pressing charges against McKee would not be good for her career. See Appellant's App. Vol. 2 at 408-09. Additionally, as noted earlier, plaintiff submitted sufficient evidence to raise an issue of fact concerning whether Reynolds Ford's stated reasons for terminating her were pretextual. Cf. Smith, 825 P.2d at 1327 (concluding that summary judgment was inappropriate based largely on factual dispute over whether stated reasons for termination were pretextual). We conclude plaintiff has presented enough evidence of retaliatory motive and causation to survive summary judgment, and reverse the district court's grant of summary judgment on her Burk claim.

D.  State law claim for intentional infliction of emotional distress

Plaintiff contends that Reynolds Ford should be liable for intentional infliction of emotional distress because it allowed McKee to harass her at work. The district court concluded that she had not shown that Reynolds Ford's actions were sufficiently outrageous or egregious to support her claim.  We agree.

Oklahoma follows the Restatement (Second) of Torts § 46(1) with regard to the tort of intentional infliction of emotional distress, and requires that a defendant's conduct be "sufficiently extreme and outrageous" to warrant liability. See Smith, 825 P.2d at 1327.  As we concluded earlier, Reynolds Ford's actions in responding to plaintiff's complaints of harassment were reasonable under the circumstances, and they were clearly not extreme or outrageous.  Most of plaintiff's argument is based on her reaction to her workplace environment and the extreme distress she claims to have suffered.  However, "'[t]he distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress . . . .'" Id. at 1327 n.2 (quoting Restatement § 46 cmt. j).  Regardless of plaintiff's reaction, Reynolds Ford's actions were not extreme and outrageous, and the district court correctly granted summary judgment on this claim.

III.

We REVERSE the district court's grant of summary judgment to Reynolds Ford on both plaintiff's Title VII retaliatory discharge claim and plaintiff's state law retaliatory discharge claim, and AFFIRM its grant of summary judgment in all other respects. We also AFFIRM the district court's dismissal without prejudice of the claims against McKee. The case is REMANDED to the district court for further proceedings consistent with this order and judgment.

Entered for the Court

Mary Beck Briscoe
Circuit Judge